# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #006

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **26th day of January, 2024** are as follows:

**BY Weimer, C.J.:**

2021-KP-00812       STATE EX REL. DARRELL J. ROBINSON    VS.    DARREL VANNOY, WARDEN, LOUISIANA STATE PENITENTIARY, ANGOLA, LOUISIANA
(Parish of Rapides)

*CONVICTION AND SENTENCE VACATED; REMANDED FOR NEW TRIAL. SEE OPINION.*

Crichton, J., concurs in part and dissents in part, and assigns reasons.
Crain, J., dissents and assigns reasons.
McCallum, J., dissents for the reasons assigned by Justice Crain and assigns additional reasons.

# SUPREME COURT OF LOUISIANA

## No. 2021-KP-00812

## STATE EX REL. DARRELL J. ROBINSON

## VS.

## DARRELL VANNOY, WARDEN, LOUISIANA STATE PENITENTIARY, ANGOLA, LOUISIANA

*On Supervisory Writ to the 9th Judicial District Court, Parish of Rapides*

**WEIMER, Chief Justice**

Certiorari was granted in this case to consider the claim of defendant, Darrell J. Robinson, that the district court erred in denying his petition for post-conviction relief. Finding merit to the claim that the State suppressed material impeachment and exculpatory evidence and presented false and misleading testimony and argument to the jury, we conclude that the suppression violated defendant's due process rights and requires reversal of his conviction under the rule of **Brady v. Maryland**, 373 U.S. 83 (1963), and **Napue v. People of the State of Illinois**, 360 U.S. 264 (1959). Accordingly, defendant's conviction is reversed, his sentence is vacated, and this matter is remanded for a new trial.

## FACTS AND PROCEDURAL HISTORY

In order to place defendant's post-conviction claims in the proper context, it is necessary to begin the discussion with a recitation of the evidence adduced and presented at defendant's 2001 capital trial for the first degree murders of Billy Lambert, Carol Hooper, Maureen Kelly, and Nicholas Kelly.

At that trial, it was revealed that defendant and victim Billy Lambert were introduced to each other at the Veteran's Administration (VA) Medical Center where they were both receiving inpatient treatment for alcoholism. While the two were still in treatment, Lambert invited defendant to live with him in exchange for performing chores on his farm. Defendant moved into Lambert's spare bedroom approximately eight days prior to the murders, but began drinking again within days. According to Lambert's cousin, David Peart, the night before the homicides, Lambert told Peart that he intended to kick defendant out of the house the next day, and send him back to the VA, because of his drinking.

At approximately 8:30 on the morning of May 28, 1996, the day of the murders, defendant purchased a bottle of vodka at the nearby Town and Country store. Later that morning, around 11:30 a.m., defendant was seen parking Lambert's truck at another grocery store.

Doris Foster, Lambert's cousin, arrived at Lambert's home on Guy Peart Road in Poland, Louisiana, at approximately 12:10 p.m. on the 28th, having made plans to have lunch with Lambert, his sister Carol Hooper, Carol's daughter Maureen Kelly, and Maureen's infant son, Nicholas Kelly. Lambert's brown Ford truck and Carol Hooper's car were parked in front of the house, but the front door was unexpectedly locked. Foster used her key to enter the house, where she discovered the bodies of her four relatives on the living room floor, all shot in the head. Lambert had been shot twice, and the other victims had each been shot once. Foster heard a noise coming from the rear of the house, so she quickly exited and drove to the nearby Town & Country store, where the clerk called 911 for her.

When Foster returned to the house with first responders, she noticed that Lambert's brown Ford truck was missing. Gary Normand was trimming trees near

2

the Lambert house when he observed a light brown Ford truck spinning its wheels as it turned off Guy Peart Road at approximately 12:15 p.m. that afternoon. Similarly, Farrell Scallan, who was eating lunch at a restaurant in the area, saw a light brown Ford truck being driven erratically on Guy Peart Road by a young man with dark hair around the same time.

Shortly thereafter, and about 11 miles away, Michael Poole encountered the brown truck when it swerved into his lane, knocking the driver's side mirror off Poole's vehicle. Poole reported that when the driver of the truck, who he identified as defendant, did not stop, he pursued him, soliciting the assistance of his friend and neighbor, Steve Halbert, when the two vehicles passed Halbert on the road.

Eventually the truck stalled at a traffic light. Poole approached the vehicle, and he and defendant engaged in a heated argument. Defendant tried repeatedly to restart the truck, and when he finally succeeded, he fled the scene.

At approximately 12:44 p.m., Poole called 911 to report the hit and run, while Halbert continued to pursue defendant, who was driving erratically, forcing other vehicles off the road. The chase continued into Evangeline Parish, where defendant turned down a gravel driveway, drove through a fence, and parked behind a house. Defendant then exited the truck and ran into the nearby woods, where police found him at approximately 2:30 p.m., crouched behind a mound of dirt. As officers approached with guns drawn, defendant reportedly blurted out: "I'm not armed. I don't have a gun." While being handcuffed, defendant additionally volunteered: "I'm on medication for violent tendencies."

According to the arresting officers, defendant was, in fact, unarmed. He was wearing a pair of shorts under blue jeans, and his clothes were stained with a

3

combination of dirt, paint, and blood.[1] Small spots of blood were discovered on the bottom of defendant's left shoe and the end of the left shoe lace. Later testing determined the blood spots on defendant's shoe were consistent with victim Nicholas Kelly's DNA.

Among the contents of defendant's pockets, officers found a yellow pocket knife belonging to Lambert and a pack of Marlboro Lights cigarettes (which Lambert was known to smoke). Defendant also had $71 cash in his wallet. Despite an extensive search of Lambert's house, his truck, the route defendant drove, and the woods where he was arrested, no murder weapon was ever located.

At the crime scene, investigators found a damp, bloodstained towel on the floor of Lambert's bedroom. Testing revealed that blood, too, was consistent with victim Nicholas Kelly's DNA. Among the items on top of a dresser in defendant's bedroom, investigators found a wallet with Lambert's identification and credit cards in it; no cash was found in the wallet. A bloodstained red jacket was found hanging on a doorknob near the victims. DNA testing of the jacket showed the bloodstains were human, but the victims and defendant were all excluded as the source. Although the victims had a total of five gunshot wounds between them, only four of the bullets were ever located.

Alfred J. Schwoeble, an expert in gunshot residue, examined defendant's clothes in 1998. Schwoeble later testified that he did not find significant particles on defendant's t-shirt or shoes. He did find two particles unique to gunshot residue, one particle characteristic of gunshot residue, and three lead-rich particles on the inside waistband of defendant's jeans. Because the particles were inside the waistband, they could not have come from the discharge of a gun, but rather had to have transferred

---

[1] DNA testing revealed the blood stains on his clothes were exclusively those of defendant.

4

from another source, such as a gun tucked into the waistband or contaminated hands. Schwoeble found six particles characteristic of gunshot residue and 40 lead-rich particles on the right leg of defendant's jeans. On the left leg, he found two characteristic particles and five lead-rich particles. In response to prosecutor's questions at trial, Schwoeble agreed the residue patterns on defendant's jeans were consistent with the right-handed defendant firing a gun downward.

Following the initial investigation, defendant was charged with four counts of capital murder. While awaiting trial in Rapides Parish, defendant shared a cell with Leroy Goodspeed. Goodspeed reported to Steve Wilmore, the lead investigator for the Rapides Parish Sheriff's Office, that on November 11, 1997, defendant told him that he "did those people, a man, two women and a small child, and threw the gun off of a bridge."

Defendant's jury was selected in St. Landry Parish and transported to Rapides Parish for trial. See, La. C.Cr.P. art. 623.1. In addition to the evidence outlined above, the State relied on circumstantial evidence to theorize that defendant killed the victims using Lambert's missing .38 caliber revolver. According to the State's theory, the victims had a total of five gunshot wounds, which meant the murder weapon had been loaded with five bullets. No guns were found in Lambert's house, but Doris Foster testified that Lambert routinely kept a gun next to his bed. She explained that she had Lambert's guns at her house for safekeeping while Lambert was in the VA Hospital. Because she was afraid of guns, and the revolver was loaded, she brought the revolver to Lambert at the VA and had him remove the bullets. Roughly a week before the murders, Foster returned the unloaded gun and the bullets to Lambert, but she forgot one of the bullets at home, so she only returned five bullets.

5

Defendant attempted to counter the State's case by arguing that he was not the perpetrator. Rather, counsel argued that defendant discovered the murders when he returned home from the store, and fled in shock and fear, much like Doris Foster. In his panic, he sideswiped Poole's car. When Poole and Halbert chased him, his panic escalated, ultimately leading him flee into the woods to escape them. As to the "bloodstain" evidence, defendant's experts established that the blood on the red jacket found at the scene was not consistent with either defendant or the victims, indicating the possibility that another person was involved. No blood spatter was detected on defendant, as would be expected after shooting several people at close range. In fact, the only blood on defendant was a minute transfer bloodstain on the bottom of his shoe and the end of that shoe's lace, which the defense attributed to stepping on a drop of Nicholas Kelly's blood when defendant stumbled upon the scene. With respect to the "gunshot residue" evidence, the defense argued that the gunshot residue on defendant's jeans was either cross-contamination from the pat-down search of defendant or transfer residue from the improper storage of his clothing. The defense pointed out that defendant's hands were not tested for gunshot residue at the time of his arrest, although the Assistant District Attorney involved in the investigation had asked officers to do so. Moreover, the arresting officers reportedly admitted to the defense investigator that they unzipped defendant's pants themselves during the pat-down.

The defense proposed that Mark Moras was the actual perpetrator of the murders. Evidence established that Moras had briefly lived with Lambert two months prior to the murders. Lambert discovered that Moras was forging checks in his name and confronted him. The two fought, and Lambert shot at Moras while chasing him out of the house. Lambert contacted the police about the checks, and Moras was

6

arrested and charged in both Rapides and Avoyelles Parishes. Lambert was murdered before the charges were resolved.

Finally, the defense challenged the credibility of jailhouse snitch Leroy Goodspeed, cross-examining him about his drug addiction, his extensive criminal history, his mental health diagnoses and medications, and his instances of lying. However, in response to direct questioning by defense counsel as to whether he had received any beneficial treatment from the State, Goodspeed denied that he was offered a deal in exchange for his testimony. The State then called attorney W.T. Armitage, who had recently represented Goodspeed in a very favorable guilty plea in Rapides Parish, to counter the defendant's insinuations that Goodspeed's testimony factored into the lenient sentence Goodspeed received.[2] Armitage testified that no mention was made of Goodspeed's involvement as a witness in defendant's trial when entering his guilty plea on the Rapides Parish charges.

Following deliberations, the jury found defendant guilty of four counts of first degree murder.[3] In accordance with the jury's unanimous recommendation, the district court imposed a sentence of death on all four counts. On direct appeal, this court affirmed, finding, in pertinent part, that the evidence was sufficient to prove defendant's identity as the perpetrator beyond a reasonable doubt under the standard enunciated in **Jackson v. Virginia**, 443 U.S. 307 (1979), and that the circumstantial evidence presented was sufficient to exclude every reasonable hypothesis of

---

[2] Although facing a possible 33 year sentence for the charges filed against him in Rapides Parish, Goodspeed entered a guilty plea and was sentenced to three years imprisonment at hard labor, with one year suspended. He was released after serving 11 months.

[3] As an aggravating circumstance on each of the four counts, the jury found defendant knowingly created a risk of death or great bodily harm to more than one person. La. C.Cr.P. art. 905.4(A)(4). As to count four (involving victim Nicholas Kelly), the jury found an additional aggravating circumstance: the victim was under 12 years old. La. C.Cr.P. art. 905.4(A)(10).

7

innocence. **State v. Robinson**, 02-1869 (La. 4/14/04), 874 So.2d 66. The U.S. Supreme Court denied certiorari. **Robinson v. Louisiana**, 543 U.S. 1023 (2004).

In 2005, defendant initiated post-conviction proceedings by filing a Pro Se Application for Post-Conviction Relief and Request for Counsel in district court. A series of supplemental and amended petitions followed, accompanied by a series of procedural objections filed on behalf of the State. The procedural objections were denied by the district court following a hearing. Subsequently, on April 2, 2014, the district court granted an evidentiary hearing on all of defendant's claims. Those claims, in a nutshell, consist of allegations that the State failed to disclose exculpatory evidence in violation of **Brady v. Maryland**, 373 U.S. 83 (1963); that the State failed to correct false or misleading testimony at trial in violation of **Napue v. People of the State of Illinois**, 360 U.S. 264 (1959) and **Giglio v. United States**, 405 U.S. 150 (1972); that the defendant is actually innocent; and that defendant received ineffective assistance of counsel in both the guilt and penalty phases of his capital trial.[4]

Prior to the evidentiary hearing, the parties began negotiating a joint stipulation regarding the undisclosed evidence forming the basis of defendant's **Brady** claim. At a hearing on May 9, 2016, the parties signed and submitted a nine page Joint Stipulation of Fact listing the evidence the defense had not received. The district court accepted the stipulation and associated exhibits into evidence. The defendant also submitted a Motion to Vacate Conviction and Sentence on the basis of the Joint Stipulation.

---

[4] Defendant additionally raised claims regarding the alleged discriminatory selection of the grand jury foreperson, alleged juror misconduct, and the cumulative effect of the errors identified, among others. Because of our ultimate resolution of this matter, it is not necessary to address these claims in any further detail.

Three days later, the defendant submitted a withdrawal of stipulated fact, seeking to withdraw a portion of the stipulation that addressed undisclosed serology notes.[5] The State responded by filing its own notice of withdrawal in which, without explanation, it withdrew its consent to the use of the vast majority of previously stipulated facts.[6]

On May 14, 2018, the matter finally proceeded to an evidentiary hearing, conducted over a period of 10 days, with additional days of depositions. Numerous witnesses, both lay and expert, testified, and volumes of documentary evidence were introduced. Given our ultimate resolution of this matter, it is not necessary to recount all of the evidence in detail. For purposes of the present inquiry, we focus on the evidence adduced with regard to defendant's **Brady** claims and the development of Mark Moras as an alternative suspect.

With respect to defendant's claim that the State withheld exculpatory material in the form of an undisclosed deal with jailhouse informant Goodspeed, defendant presented the following evidence, which was discovered post-conviction.

On January 28, 1998, Goodspeed's wife, Becky Goodspeed provided a statement to police. That statement contained marginal notes which had been scribbled over in an attempt to obscure them. The notes appear to state, in part, "try

---

[5] The relevant portion of the stipulation indicated that defense counsel would testify that 54 pages of bench notes and diagrams related to the North Louisiana Crime Lab's 1996 serology report were not provided to defense counsel and were absent from both the defense file and the district attorney's file. The withdrawal pleading explained that after additional review, it was discovered that the district attorney's file did, in fact, contain the undisclosed notes.

[6] The State's notice of withdrawal followed the replacement of the Assistant District Attorney who negotiated the Joint Stipulation of Facts with a Special Assistant District Attorney retained for the purpose of handling the post-conviction proceedings.

When the State later submitted an Amended Notice of Withdrawal in which it "re-admitted" three of the stipulated facts it had withdrawn, it alleged that any disclosure of the State's rationale for withdrawing the stipulated facts was protected under La. C.E. arts. 506 and 509.

and reconcile...said this may help you to get out Det[ention]." When the statement was turned over to trial counsel, a black marker completely obscured the notes.

On December 18, 2000, Goodspeed's probation officer, Scotty Melancon, sent a letter to Judge Ross Foote in Rapides Parish advising the Judge that on December 14, 2000, Goodspeed, who was on probation in connection with a 1997 guilty plea, had been arrested on charges of principal to first degree robbery in Lafayette Parish. Melancon recommended that no action be taken against Goodspeed at that time. The Rapides Parish District Attorney's Office was copied on the letter, and the copy was found in the District Attorney's files. It was not provided to defense counsel.

Assistant District Attorney Greg Wampler, who was originally assigned to handle defendant's post-conviction petition for the Rapides Parish District Attorney's Office and who negotiated the stipulations with defense counsel that were later presented to the district court, testified that he spoke with Melancon about the letter and Melancon told him he would not have written the letter to Judge Foote unless someone had asked him to do so.[7]

On February 26, 2001, Goodspeed was charged in Lafayette Parish with issuing worthless checks, and on February 15, he was formally charged by bill of information as a principal to first degree robbery. As a fourth felony offender, Goodspeed faced a mandatory sentence of imprisonment for life without parole for these offenses. The Louisiana Department of Corrections CAJUN database shows that Goodspeed's Rapides Parish convictions were pardoned on January 29, 1999 and on February 2,

---

[7] For his part, Melancon explained via deposition that he does not recall the details surrounding the issuance of the letter, but that it was not unusual to not recommend revocation when there is a pending charge, and "apparently I chose not to recommend revocation, between my supervisor and I."

2001, although as a habitual offender he was not eligible for pardons without first going before the Pardon Board.

Goodspeed testified against defendant on March 7, 2001. In response to questioning, he stated that he did not receive anything in return for his testimony, nor was there any promise of future benefit. His Rapides Parish defense attorney, W.T. Armitage, was called by the State and verified that Goodspeed's testimony was not a factor in his lenient sentence on the Rapides Parish charges.

The records of the Lafayette Parish District Attorney's Office reflect that on May 17, 22, and 31, 2001, Prosecutor Mike Shannon left messages for the Lafayette Parish ADA prosecuting Goodspeed on the first degree robbery charge, Luke Edwards. Edwards sent a five page fax to Shannon on June 7, with the message: "Per your request Leroy Goodspeed." While the transmittal sheet was found in the District Attorney's file, the 4 pages forming the substance of the fax were not located.

On June 19, 2001, Edwards requested, and was granted, a continuance in Goodspeed's first degree robbery case. The same day, Goodspeed wrote a note to the supervising officer at the Lafayette Parish Correctional Center stating: "Dear Sir Would you please check and see if I have any hold's [sic] or warrents [sic] on me. I went to court and the DA is going to give me time served on 8-13-01. I should go home that day. 'Just making sure nothing stop's [sic] me at that time.'" In keeping with that note, the State dismissed Goodspeed's principal to first degree robbery charge in Lafayette Parish on August 13, 2001. Then, on October 25, 2001, "BL" left a note for Lafayette Parish ADA Thomas Frederick. The note stated: "Tommy, Luke Edwards is requesting that you dismiss the check charge. Luke states Mr. Goodspeed was an essential witness in a murder trial." In keeping with that note, the issuing worthless checks charge was dismissed by ADA Frederick on November 6, 2001.

11

Neither the post-trial communications between Edwards and Shannon, nor the note requesting dismissal of Goodspeed's issuing worthless checks charge were provided to defendant's trial counsel, although defendant's conviction was pending on direct appeal at that time.

Susan Herrero, defendant's post-conviction mitigation specialist, testified that she spoke with Leroy Goodspeed on March 20 and 22, 2012. In their initial conversation, Goodspeed relayed that he had been given a deal by Prosecutor Shannon in exchange for his testimony against defendant. In their second conversation, Goodspeed suggested that Ms. Herrero look for a letter that the Rapides Parish prosecutor wrote to the Lafayette Parish prosecutor asking to have Goodspeed's charges dropped. He reiterated that he got a deal in exchange for his testimony, but he also stated he did not want to come back to Louisiana because he did not want to get into trouble.[8]

Finally, Kevin Nichols testified that he shared a cell with Leroy Goodspeed and was present when Goodspeed returned from testifying at defendant's trial. He reported that Goodspeed was very angry when he returned because, as Goodspeed explained, he felt he had been badly "incriminated" by defense counsel on cross-examination and that, as a result, his deal might not go through.

For his part, Mike Shannon, the lead prosecutor at defendant's trial, explained that, as regards the statement from Becky Goodspeed, when he reviewed witness statements, it was his practice to write notes in the margins. If those notes did not contain exculpatory information, he would instruct his secretary to black out the notes before turning the statement over to defense counsel. Shannon further testified that he does not know who Scotty Melancon is, and never spoke with Melancon regarding

---

[8] Mr. Goodspeed died on June 11, 2016, prior to the hearing date.

12

Leroy Goodspeed. He stated that from their first meeting, he informed Goodspeed that he only wanted the truth, and that he was not going to offer Goodspeed anything in exchange for his testimony.

When asked whether he had ever spoken with anyone in Lafayette about Goodspeed, Shannon replied: "Never with Melancon ... I did after trial have communication with the ADA in Lafayette."[9] According to Shannon, after defendant's trial, his nephew asked him "to put in a good word for [Goodspeed]" because they had been in a halfway house together. He further explained: "I want to say it was in May of 2000, two months after trial, and LeRoy Goodspeed also called me about that same period of time and said, can you just put in a good word for me." Before he would agree to do so, Shannon testified, he contacted the Lafayette Parish District Attorney's office to obtain the police reports, and he could "just about bet my last dollar" that the missing pages from the fax were the police report. Because he felt the circumstances of the robbery "were not a real serious thing" and because he felt sorry for Goodspeed because of the grueling cross-examination he had endured at defendant's trial, he called Edwards and asked him to "find a way to assist him...He was a material witness in a murder case." According to Shannon: "[T]hat's all I told LeRoy I would do after trial. I said, look, it's out of my jurisdiction, LeRoy. I have no authority. All I can do is call and ask."

In addition to evidence regarding the undisclosed deal with Goodspeed, defendant presented evidence of other materials discovered post-conviction that were allegedly not disclosed, despite specific and detailed discovery requests. According to defendant, first among the materials are approximately 51 pages of serology bench

---

[9] Shannon did acknowledge that he knew about the pending Lafayette Parish charges prior to trial and that he had visited Goodspeed in the Lafayette jail a couple of times.

13

notes as well as diagrams of physical evidence prepared in connection with a November 7, 1996, Serology Report issued by the North Louisiana Criminalistics Laboratory. These bench notes and diagrams demonstrate the presence and classification of blood evidence, contain information about serological and DNA testing, and provide an outline of the forensic investigation and testing. Of particular relevance, and a focus of the evidentiary hearing, was testing performed on the red jacket found hanging on a doorknob in the hallway of the Lambert residence with the left sleeve turned inside out. The bench notes indicate the presence of high and medium velocity impact blood spatter on the front, back and sleeves of the red jacket, as well as transfer blood stains on the back of the jacket. The transfer stains do not match the DNA profile of either defendant or any of the victims. Photographs taken at the crime scene and found in the possession of the crime lab include close-up images of the red jacket and of a blood drip on the neighboring wall. A letter sent via facsimile transmission from District Attorney's Office Investigator Ray Delcomyn to David Exline of RJ Lee Group (the group that performed the gunshot residue testing for the State) explains the "significance of this jacket." As set forth in the letter, which was found in the District Attorney's files but which was not disclosed to defense counsel: "The crime lab has reported finding high velocity blood spatters on the sleeve areas of this jacket. The blood contained in these high velocity spatter was insufficient for an identification. However, two other spots of blood were noted on the jacket, and this blood does not match the defendant or any of the victims."

At trial, David Peart was called by the State to offer a possible explanation for the presence of the foreign blood stains on the jacket. He testified that Lambert wore the jacket when they were working together on the farm and that he, Lambert, and his workers cut themselves on barbed wire used for their cattle business and then rode

14

together in Peart's truck. Lead defense attorney Michael Small testified that had he

been provided with the serology evidence–the blood drip on the wall and the presence

of high and medium velocity impact blood spatter on the jacket–he would have used

that evidence to impeach Peart's testimony about how the foreign DNA got on the red

jacket.[10]

Defendant also produced testimony and evidence with regard to ballistics

bench notes and photographs in the possession of the crime lab that showed ricochet

marks and diagrams of the crime scene, which notes and photographs defense counsel

did not find in any of his files. Attorney Small testified that had he been provided

with these materials, he would have used them to develop evidence as to bullet

trajectories and to possibly impeach the State's theory of how the crimes unfolded.[11]

In response to defendant's allegations regarding the failure to disclose the

specified materials from the crime lab, the State presented the testimony of Thomas

Willson, the Assistant District Attorney who assisted Shannon in prosecuting

defendant and who handled most of the forensic evidence. Willson testified that he

learned from Shannon that the defense had specifically requested notes from the

crime lab, so he instructed Investigator Delcomyn to obtain them and deliver them to

the defense.[12]

---

[10] Stuart James, an expert in bloodstain pattern analysis, testified at the post-conviction hearing that the blood stains on the red jacket and the passive drip stain on the wall were most likely part of the same bloodshed event.

[11] John Nixon, an expert in firearms, ammunition, and gunshot residue, testified that gunshot residue analysis has "fallen out of favor because of the lack of probative value," and that under current testing protocols, defendant's clothing would not have tested positive for gunshot residue. He further opined that, based on photos of the crime scene and ricochet and divot marks, at least six or more shots were fired and the probability of more than one shooter is more than fifty percent.

[12] For his part, Delcomyn testified via deposition that in early March 1999, he took it upon himself to author a letter to T.J. Shuflin, the director of the Crime Lab in Alexandria, under Shannon's signature, requesting any and all laboratory notes, and then sent a separate letter to the Shreveport lab requesting the same. Delcomyn testified that he delivered a large packet of materials that he received to Attorney Small's office, but did not examine the contents of the package.

Prosecutor Shannon testified that initially he did not agree to open file discovery, but during a recess in a hearing in February of 2000, he made an agreement with the defense "to open the doors of the crime lab." According to Shannon, after the recess, the defense stated for the record that the parties had "reached an agreement to tour the lab," which meant the defense could "look at everything" related to defendant's case.[13] Later, he testified: "As you know, I've been accused of hiding those lab notes and as I recall and understand Mr. Delcomyn asked for them at my request sometime into the case. When the lab notes came in Ray brought them to me. I did not open the envelope. I did not look at them. I told Ray, Mr. Willson is handling DNA, bring them to Mr. Willson." Shannon further testified that the lab notes were brought to trial, and that Willson questioned expert Curtis Knox on the lab notes, and Attorney Small cross-examined Knox referencing the notes. On cross-examination, he testified, "Listen, I never saw the serology notes until it was attached to y'all's post-conviction."

Finally, defendant presented evidence regarding his allegations that the State failed to disclose exculpatory information from eyewitnesses developed during its investigation of the crimes. Specifically, defense counsel Small testified that he did not receive a four page transcription of the statement of Gary Normand, who testified at trial. That statement, taken on June 5, 1996, contains a handwritten note at the top

---

[13] A transcript of the February 2, 2000 hearing shows that the defense had filed a motion for open file discovery, which the State opposed. After argument from both parties, the court denied open file discovery on the grounds that "I don't think there is anything else that can possibly pop up that hasn't already popped up in this trial." The court added that as of that date, no new evidence would be admitted at trial.

The court then addressed a defense subpoena for records related to crime lab protocols, policies, and procedures. The court briefly recessed to allow the defense to confer with the state crime lab's director, T.J. Shuflin. When court resumed, defense counsel Danalynn Recer announced that "I talked with Mr. Shuflin and he's agreed to allow us and our experts to tour the labs both here in Alexandria and at their Shreveport facility. We've reached that agreement." Defense counsel Small added: "And that satisfies the subpoena, Judge."

of the first page that states: "Says he may have seen another auto–leaving going south (rt. before lunch)–could have been 10:00–check with Wayne Normand." In addition, while Small did receive a transcription of the June 4, 1996, interview of Andrew Dunn, that transcript did not contain handwritten notes that appear on the second page of the interview that read: "Kirby Brown–saw someone–drop Robinson off–that mo[rn]ing." Post-conviction investigators located and interviewed Mr. Brown, whose signed statement, introduced at the hearing, declares that on the day of the murders he observed defendant being dropped off across the road from Billy Lambert's place around noon or later, which places defendant outside the time frame in which the State postulated the murders were committed.[14]

In addition to his **Brady** claims, and in support of his claim of actual innocence, defendant presented evidence that he alleges points to Mark Moras as the perpetrator of the murders. Specifically, defendant offered evidence establishing that the transfer bloodstain on the outside of the red jacket found at the crime scene matches a DNA sample obtained from Moras. A previously untested bloodstain on the lining of the jacket was also matched to Moras's DNA. In addition, counsel obtained a statement from Wayne Guillot, Moras's neighbor, that contradicts Moras's statement to Investigator Delcomyn that he spoke to Guillot on the morning of the murders and learned of the murders from Guillot. Guillot, a volunteer fireman who was called to the crime scene to help direct traffic, denied speaking with Moras that day or telling him anything about the murders.

---

[14] In furtherance of his claim of numerous **Brady** violations by the State, defendant also presented evidence that the State failed to disclose records from the Rapides Parish Coroner's office showing victim Carol Hooper had a life insurance policy, and that Detective Steve Wilmore of the Rapides Parish Sheriff's Office consulted a psychic during the course of his investigation into the murders.

Post-conviction investigator Gary Eldredge interviewed Louella Rollins, Moras's girlfriend at the time of the murders. He testified that Louella told him she worked as a housekeeper for Billy Lambert and was supposed to clean his house on the day of the murders, but Lambert called and cancelled the appointment. When Moras appeared at her home that morning, he was "loaded" and hostile. Rollins's father had to pull Moras off of her. After her father intervened, Moras was still worked up and said he needed more drugs, that Lambert owed him money, and that he was going to Lambert's to get his money. Moras took the keys to her truck and left. She did not see him again until late that afternoon when he returned her truck and reported that he had gotten money from Lambert.

Finally, Linda Lachney, whose father was friends with Lambert, testified that on the morning of the murders, Lambert called her father at around 7:00 or 7:30 in the morning and asked him to stop by. She and her father brought her mother to work, then went to Lambert's house. As they approached the house, she saw defendant running from the property going toward the railroad track, looking scared. She saw a truck and a car parked at the house. They parked and walked up to the door, but got no answer when they knocked. Lachney testified that she looked in the window and saw the bodies of the victims on the floor. They left and returned to her father's house, where she placed an anonymous call to 911. She and her father then drove to the Town & Country store and watched as police and ambulances arrived. According to Lachney, Moras was a drunk and a "drug head" who would run his mouth. She testified that she overheard him talking to his brother Abe (who she had dated) about stealing money from Lambert and where the two had buried it. Although she disputed large parts of an affidavit she had previously signed, she verified that aspects of the affidavit were true. Specifically, she testified that she heard Moras talking

18

about having stolen a lot of money from Lambert by forging Lambert's checks, that he was being prosecuted for the forgeries, and that he wanted to get Lambert, but Lambert was killed before he could get to him.

Finally, post-conviction investigation uncovered a check that Lambert had written to defendant on May 24, 1996, four days before the murders. The check was in the amount of $75.00, and the word "labor" was written on the memo line, providing an alternate explanation for the $71.00 in cash found on defendant at the time of his arrest.

Following the conclusion of the hearing, after supplemental filings and extensive briefing, the district court issued a judgment denying all claims for post-conviction relief on the finding that defendant "has failed to carry his burden of proof." In written reasons, the court rejected defendant's arguments that the State suppressed material exculpatory evidence in violation of **Brady**, and that defendant received ineffective assistance of counsel, writing: "Certainly, post-conviction counsels have raised concerns as to certain items or veracity of certain witnesses, however that information alone does not convince this Court that evidence was withheld which violated **Brady** or that trial counsel was ineffective. The defendant was provided a fair trial." The district court did not address defendant's factual innocence claim.[15] On defendant's application, this court granted a supervisory writ

---

[15] In brief, defendant contends that the district court erred in failing to address his factual innocence claim. He noted that since the district court's ruling in this case, the legislature enacted La. C.Cr.P. art. 926.2, which provides for post-conviction factual innocence claims based on "new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial," and that is "scientific, forensic, physical, or nontestimonial documentary evidence," or "testimonial evidence that is corroborated" by such evidence. La. C.Cr.P. art. 926.2(B)(1)(a). A defendant is entitled to relief under this article upon presenting clear and convincing evidence, considered "in light of all the relevant evidence" that "had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any felony offense that was a responsive verdict to the offense of conviction." La. C.Cr.P. art. 926.2(B)(1)(b). The legislation expressly makes the article applicable to defendant, whose claim for post-conviction relief was filed before December 31, 2022.

19

to assess the correctness of the district court's ruling. **State ex rel. Robinson v. Vannoy**, 21-00812 (La. 6/26/23), 363 So.3d 1230.

## LAW AND ANALYSIS

In **Brady v. Maryland**, 373 U.S. 83, 87 (1963), the United States Supreme Court held that suppression by the prosecution of evidence favorable to the accused after receiving a request for the evidence violates a defendant's due process rights where the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. For purposes of the State's due process duty to disclose, no difference exists between exculpatory evidence and impeachment evidence. **State v. Kemp**, 00-2228, p.7 (La. 10/15/02), 828 So.2d 540, 545. The **Brady** rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may determine guilt or innocence, and applies whether a general, specific or even no request at all is made for the evidence. **United States v. Bagley**, 473 U.S. 667, 676, 682 (1985); **State v. Knapper**, 579 So.2d 956, 959 (La. 1991).

It is important to note that **Brady** and its progeny do not establish a general rule of discoverability, and not every case in which it is discovered post-trial that favorable evidence was withheld by the State will result in a reversal of the conviction. A prosecutor does not breach any constitutional duty to disclose favorable evidence unless the "omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." **United States v. Agurs**, 427 U.S. 97,

---

La. C.Cr.P. art. 926.2(A). Because the district court did not make a finding regarding defendant's factual innocence claim under the criteria enacted in this recent article (or under the previous jurisprudential standard either for that matter), this court would ordinarily be inclined to remand this matter to the district court for consideration of defendant's factual innocence claim under the new provisions of La. C.Cr.P. art. 926.2. However, because of this court's decision to grant defendant a new trial, it is unnecessary to do so.

20

108 (1976). For purposes of **Brady**'s due process rule, a reviewing court determining materiality must ascertain "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence, he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." **Kyles v. Whitley**, 514 U.S. 419, 434 (1995). Thus, the reviewing court does not put the withheld evidence to an outcome-determinative test in which it weighs the probabilities that the petitioner would have obtained an acquittal at trial or might do so at a second trial. Instead, a **Brady** violation occurs when the "evidentiary suppression 'undermines confidence in the outcome of the trial.'" **Kyles**, 514 U.S. at 434 (quoting **Bagley**, 473 U.S. at 678). And, most importantly, this is assessed by evaluating the cumulative effect of the undisclosed evidence. **Kyles**, 514 U.S. at 436. As we have explained: "It is not enough for reviewing courts to consider the impact of each item of exculpatory evidence standing alone; the cumulative effect of the suppressed evidence must be considered." **State v. Marshall**, 94-0461, p. 15 (La. 9/5/95), 660 So.2d 819, 826. In other words, a **Brady** violation is shown when undisclosed favorable evidence, considered cumulatively and not item by item, could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. **Kyles**, 514 U.S. at 435-36.

While the foregoing rules apply broadly in the assessment of **Brady** claims, there is a singular category of undisclosed evidence that is subject to a slightly lower standard of materiality under **Brady**, and that consists of previously undisclosed evidence revealing that the prosecution introduced trial testimony that it knew or should have known was false. **Agurs**, 427 U.S. at 103-104. Rudimentary principles of justice are offended, and due process is violated, when a prosecutor deceives a court and jurors with the presentation of known false evidence. **Giglio**, 405 U.S. at

21

153. The same holds true when the prosecution, although not soliciting false evidence, allows it to go uncorrected when it appears. **Napue**, 360 U.S. at 269. In such instances, a new trial is required if "'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury.'" **Giglio**, 405 U.S. at 154 (quoting **Napue**, 360 U.S. at 271).

With the foregoing principles in mind, we turn to defendant's contention that the district court erred in rejecting his claim that the State failed to disclose material exculpatory evidence in violation of **Brady**, and that the State knowingly failed to correct misleading evidence at trial, in violation of **Giglio** and **Napue**.

To prevail on his **Brady** claim, defendant was required to demonstrate that (1) the State suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material. **LaCaze v. Warden Louisiana Correctional Institute for Women**, 645 F.3d 728, 735 (5th Cir. 2011). Because they are inter-related, we will discuss the first two prongs of defendant's required **Brady** showing together, before proceeding to analyze the materiality requirement.

### _Suppression of Evidence Favorable to the Defense_

In its written reasons, the district court identified the evidence forming the crux of defendant's **Brady** claim as allegations that (1) Goodspeed, jailhouse informant, received an undisclosed deal; (2) serology report and notes were withheld; (3) other forensic evidence [was] withheld; _i.e._, investigator's letter to R. J. Lee Group and photographs, ballistics bench notes, sketches and diagrams; and (4)

eyewitness information inconsistent with trial testimony [was] not provided.[16] We

will address each of these items of evidence separately.

*Jailhouse Informant Goodspeed*

As to jailhouse informant, Goodspeed, the district court found that the evidence

establishes that the State failed to disclose that Goodspeed in fact testified in

exchange for beneficial treatment. Specifically, the district court found:

> During the post-conviction hearing, more detailed evidence came forth
> that appears to indicate Goodspeed may have been allowed special
> treatment. The records submitted show that the State twice entered
> pardons into the state's offender tracking system, when that is typically
> not an option for offenders. Robinson's team provided affidavits from
> other witnesses who reported that Goodspeed after testifying made
> comments to an inmate, Kevin Nichols about receiving a deal.
> Documentation existed wherein communications between the Rapides
> Assistant District Attorney and Lafayette Assistant District Attorney
> exchanged phone messages and shortly after the Robinson trial, the
> Lafayette charges were dismissed. The record is full of instances,
> circumstantial, that further supports the flawed character of Goodspeed
> and his desire to have a deal.

Review of the record convinces this court that the district court's factual

conclusion that Goodspeed both desired to have a deal and received special treatment

in exchange for his testimony is amply supported by the evidence adduced at the post-

conviction hearing and is not an abuse of discretion. See, **State v. Thompson**, 11-

0915, pp.13-14 (La. 5/8/12), 93 So.3d 553, 563 (quoting **State v. Wells**, 08-2262, p.

4 (La. 7/6/10), 45 So.3d 577, 580) ("[W]hen a trial court makes findings of fact based

on the weight of the testimony and the credibility of the witnesses, a reviewing court

owes those findings great deference, and may not overturn those findings unless there

---

[16] There are two additional items of evidence that defendant alleged were not disclosed, the life
insurance policy of victim Carol Hooper, and the fact that one of the lead investigators, Det.
Wilmore, consulted with a psychic. The district court found that the State did not have knowledge
of the existence of the life insurance policy and that the consultation with the psychic was a false
lead, that the State had no general duty to disclose, citing **State v. Broadway**, 17-0825, p. 8 (La.
9/21/18), 252 So.3d 878, 885. We find no error in these findings, and no reason to disturb the
district court's ruling as to these items of evidence.

is no evidence to support those findings.") The fact that this evidence was not disclosed is not disputed.

Nonetheless, the State challenges the district court's fact findings, arguing that defendant failed to produce direct evidence of the existence of an undisclosed deal prior to defendant's trial, and that the evidence, at most, proves that prosecutor Shannon decided to reward Goodspeed after trial. Contrary to the State's suggestion, however, a **Brady** violation has never been limited to cases where the facts demonstrate that the state and the witness have reached a bona fide, enforceable deal. **LaCaze**, 645 F.3d at 735. The key question, insofar as **Brady** is concerned, "is not whether the prosecutor and the witness entered into an effective agreement, but whether the witness 'might have believed that [the state] was in a position to implement ... any promise of consideration.'" *Id.* (quoting **Napue**, 360 U.S. at 270). As this court has explained:

> [T]o the extent exposure of a witness's motivation is a proper and important function of the constitutionally protected right of cross-examination, a witness's "hope or knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest." **State v. Brady**, 381 So.2d 819, 822 (La. 1980) (collecting cases); see also **State v. Nash**, 475 So.2d 752, 755-56 (La. 1985). A witness's bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct. *Id.*

**State v. Vale**, 95-1230, p. 4 (La. 1/26/96), 666 So.2d 1070, 1072.

Here, the testimony demonstrates that Goodspeed had charges pending in both Rapides and Lafayette Parishes. While the State went to great lengths to dispel any notion that Goodspeed had received beneficial treatment in connection with his Rapides Parish charges, going so far as to call Goodspeed's Rapides Parish defense attorney at defendant's trial to verify that Goodspeed's testimony was not a factor in his lenient sentence in Rapides Parish, Goodspeed told post-conviction investigator

24

Herrero that he had been given a deal by prosecutor Shannon in exchange for his testimony, and that evidence of the deal could be found in the Lafayette Parish prosecutor's files. The undisclosed communications between the Rapides and Lafayette Parish DA's offices that followed on the heels of Goodspeed's testimony at defendant's trial, and the subsequent dismissal of Goodspeed's first degree robbery charge and his issuing worthless check charge because "Mr. Goodspeed was an essential witness in a murder trial," corroborate Goodspeed's statement to Ms. Herrero.[17] Moreover, Kevin Nichols, a cell mate of Goodspeed at the time of defendant's trial, testified at the post-conviction hearing that Goodspeed was upset when he returned from testifying because he felt he had been "incriminated" on cross-examination, and, as a result, his deal might not go through, providing further evidence of Goodspeed's belief that he would be receiving favorable treatment in exchange for his testimony. While the State insists that the testimony of Ms. Herrero and Mr. Nichols is not credible, the district court found otherwise, and that credibility determination is particularly within the province of the trier of fact, here the district court. See **State v. Higgins**, 03-1980, p. 17 (La. 4/1/05), 898 So.2d 1219, 1232 ("The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness.").

Finally, despite the State's insistence that the defendant failed to present evidence of having received undisclosed special treatment prior to his trial testimony, as the district court noted, "[t]he records submitted show that the State twice entered pardons into the state's offender tracking system, when that is typically not an option for offenders." This occurred on January 29 and February 2, 1999, after Goodspeed

---

[17] This court has noted that a prosecutor's duty to disclose material exculpatory evidence does not end with a jury's verdict. **State v. Pierre**, 13-0873, p. 11 (La. 10/15/13), 125 So.3d 403, 410.

had come forward and before he testified at defendant's trial. Further, found in the District Attorney's files was a letter from Goodspeed's probation officer, Scotty Melancon, dated December 18, 2000, advising that Goodspeed had been arrested on charges of principal to first degree robbery in Lafayette Parish and recommending that no action be taken with regard to revoking his probation at that time. This evidence, while circumstantial, demonstrates special treatment that could have been used as impeachment evidence at trial to counter Goodspeed's claim that he received no special favors from the State. The prosecution had a duty to disclose it.[18]

*Serology Report and Notes*

As to bench notes as well as diagrams of physical evidence prepared in connection with a Serology Report issued by the North Louisiana Criminalistics Laboratory, the district court found that the post-conviction evidence demonstrated that the prosecution had obtained 51 pages of serology documents from the crime lab, but failed to disclose at least some portion of the notes to the defense. ("What remains uncertain to this court is whether the entire 51-page section was provided.") The court noted that the State offered contradictory testimony about its efforts to turn over all records to defense counsel, but ultimately concluded that the defense likely had the notes because defense counsel Michael Small did not object at trial when the State's DNA expert, Curtis Knox, referred to lab analyst Dawn Tingle's notes on two occasions during his testimony. The court found that although it appeared some portion of the 51 pages of serology notes was not disclosed, other portions were not only exchanged and shared but used during trial. The court speculated that "[w]hat

---

[18] The same analysis holds true with respect to the statement of Goodspeed's wife, Becky, in which marginal notes stating "try and reconcile … said this may help you to get out Det," were completely obscured by a black marker before being turned over to defense counsel. These notes cast doubt on Goodspeed's claim at trial that his decision to come forward was entirely an act of conscience uninfluenced by any selfish motive, and as such, constitute impeachment evidence that should have been disclosed.

perhaps has been discovered these many years later are the records not used during trial."

The bench notes and diagrams referenced, and which defendant maintains were not disclosed, demonstrate, among other things, the presence of high and medium velocity impact blood spatter on the front, back, and sleeves of the red jacket found hanging on a doorknob in the hallway of the Lambert residence, as well as transfer blood stains on the back of the jacket, which do not match the DNA profile of the defendant or any of the victims.[19] In addition, photographs taken at the crime scene and found in the possession of the crime lab include close-up images of the red jacket and of a blood drip on the adjacent wall. Defendant maintains this evidence was exculpatory to the extent it connects the jacket to the homicides and supports the narrative that someone other than defendant was in Lambert's home, bleeding, at the time of the homicides. The State counters the blood stain evidence is not exculpatory because there is no evidence the perpetrator was injured during the murders, nor is there evidence as to when the blood stains on the back of the jacket identified as matching the DNA profile of Mark Moras were deposited on the jacket. Because Moras had lived in the Lambert home and worked with Lambert on his farm, the State argues there is an alternative explanation for the presence of his blood on the jacket. The State's argument misconstrues its duty under **Brady**. Evidence need not be definitive to be exculpatory. **Kyles**, 514 U.S. at 450-451 ("Such argument, however, confuses the weight of the evidence with its favorable tendency[.]"). Here, the evidence is exculpatory in that it supports defendant's theory of the case, *i.e.*, that an

---

[19] The transfer blood stains on the back of the jacket were ultimately linked to alternative suspect, Mark Moras, through post-conviction DNA testing.

unidentified person who was neither defendant nor one of the victims was present and involved in the murders.

Despite the State's failure to disclose at least some portion of this exculpatory evidence, the district court found no **Brady** violation, noting that the defense retained its own serology experts, and had physical possession of the red jacket for testing and inspection. Further, the court pointed out that the State had offered to allow the defense "to explore the lab and secure any and all records the trial counsel could want." Thus, the district court reasoned, citing **State v. Harper**, 10-0356 (La. 11/30/10), 53 So.3d 1263, there was no **Brady** violation because the State is not obligated to provide a defendant with information he already has or can obtain with reasonable diligence.

Before this court, defendant contests the district court's factual findings in two respects. First, defendant argues the district court erred in finding that some portion of the crime lab's serology notes were "exchanged and shared [and] also used during the trial." Second, defendant disputes the district court's conclusion that the defense had access to the lab notes because the defense and its experts were permitted "to explore the lab and secure any and all records trial counsel could want." Both of these findings are, in fact, contradicted by the trial record.

In concluding that notes from the crime lab were brought to the attention of trial counsel and "appear[] to have been used during the trial by all attorneys," the district court cited to two excerpts from the trial transcript. In the first, defense counsel Michael Small asked the State's expert witness, Curtis Knox, about blood stains circled on Exhibit S-31, the bloodstained towel found in Lambert's room. Knox replied that he saw four stains that were marked as positive for blood but not

28

tested for DNA, and added: "Looking at Ms. Tingle's notes, there is another area that she has designators in the area that she tested, but it is not circled on that item."

In the second excerpt cited by the district court, Small asked Knox: "Let me ask you this. Would your notes easily or readily reflect the date of Ms. Tingle's screening?" Knox replied: "Well, it would be her notes. But, I have a copy of them."

Contrary to the district court's finding, these excerpts merely demonstrate that Knox had the lab notes. They do not indicate defense counsel had access to them, that he ever saw them, or that he was aware of them before Knox mentioned them during his testimony. In fact, the trial transcript shows that defense counsel Small expressly told the witness that "all the [reports] in this case to which I have been made privy are certified reports." The serology bench notes are not certified reports.

A review of the trial transcript demonstrates that the parties only questioned Knox about the certified reports and the trial exhibits. While some of Knox's responses indicated that he was referring to or consulting notes, nothing in the transcript indicates the defense had access to those notes, or that the notes were "used during the trial by all attorneys."

In the same vein, a review of the contemporaneous trial transcript reveals that the district court incorrectly reported the agreement that was reached between the prosecution and defense with respect to the offer to tour the crime lab. The record reveals that, in satisfaction of a defense subpoena for documentation of the crime lab's procedures, policies, and protocols, the parties agreed to allow the defense and its experts to tour the lab facilities in Alexandria and Shreveport. The agreement did

not address the serology notes or the lab's records, and contrary to the district court's statement, did not encompass "any and all records the trial counsel could want."[20]

Defense attorney Small affirmed in his post-conviction testimony that the serology notes were never produced to him, and that he did not refer to any such notes during his cross-examination of Knox. And, while the State withdrew its negotiated stipulation that the serology notes were not provided to defense counsel and argued instead that the serology notes were turned over to the defense, as the district court's reasons acknowledge, the testimony from the State's witnesses on this point was conflicting. ("At the post-conviction hearing, there was a dispute between the witnesses about the efforts to turn over all records to trial counsel."). Moreover, while insisting that the offer to tour the crime lab gave defense counsel free reign to access any and all materials, prosecutor Shannon acknowledged on cross-examination that he did not in fact agree to open file discovery. The district court's conclusion that the serology notes were available to and used by all counsel at trial, and that the State's offer to tour the crime lab facilities afforded counsel any and all records counsel could want are not supported by the trial record, and are an abuse of discretion.

In addition to challenging the district court's factual conclusions regarding the disclosure of the serology notes, the defendant questions the district court's determination that the State had no duty to disclose the crime lab's conclusions about the blood-spattered red jacket because the defense had access to the evidence and the opportunity to conduct its own testing and consult its own experts.

---

[20] In fact, when the parties announced an agreement had been reached for defense counsel and its experts to *tour* the State's crime lab, Attorney Small was quite clear in adding that the agreement "satisfies the subpoena" for records related to the crime lab protocols, policies and procedures; no more expansive agreement than this was memorialized.

30

For the general proposition that the prosecution has no obligation to provide a defendant with information he already has or can obtain with reasonable diligence, the district court cites **Harper**, *supra*. However, under the particular facts of this case, reliance on the broad proposition of law announced therein is misplaced.[21] The applicable procedure article is La. C.Cr.P. art. 719, under which the prosecution is obligated to disclose, upon written request of the defendant, "any results or reports, or copies thereof, ...of scientific tests or experiments, made in connection with or material to the particular case, that are in the possession, custody, control, or knowledge of the district attorney and intended for use at trial." La. C.Cr.P. art. 719(A). Here, defense counsel not only filed a detailed Motion for Discovery and Inspection requesting documents, photographs, and tangible objects in the possession of the State, which are favorable to defendant and material and relevant to issues of guilt or punishment, as well as any results or reports of scientific tests or experiments intended for use at trial, but also a Motion for Expanded Discovery in a Death Penalty Trial, specifically requesting scientific and forensic evidence, expert notes, records and expert reports and all raw data related thereto. That the State recognized the need to disclose the requested information is not seriously disputed. In its original Answer to Motion for Discovery, the State assured defendant that while scientific testing had not yet been reduced to writing, "upon receipt of crime lab documentation same will be immediately provided to the defendant." While in a Second Supplemental and Amending Answer to Motion for Discovery and Inspection the State attached a number of forensic reports and notes, the serology notes were not among them,

---

[21] The frequently cited notion that the prosecution has no obligation to provide a defendant with information he already has or can obtain with reasonable diligence contemplates information relating to the defendant's own health, actions, or history, *i.e.,* **State v. Hobley**, 98-2460 (La. 12/15/99), 752 So.2d 771, 785-86, or information contained in public case records, *i.e.,* **United States v. Newman**, 849 F.2d 156, 161 (5th Cir. 1988).

31

despite assurance in the answer that copies of all scientific tests and/or experiments and physical examinations had been provided.

Thus, there was a specific written request for the reports and notes from the Crime Lab in accordance with La. C.Cr.P. art. 917(A) that the State was obligated to satisfy. The provisions of La. C.Cr.P. art. 917(B), which state that, upon motion, the defendant shall be allowed to conduct his own DNA testing of samples the court ordered him to provide, do not relieve the State of its obligation to disclose exculpatory information in its possession. The testing authorized under La. C.Cr.P. art. 917(B) is "[i]n addition" and not alternative to the disclosure obligation under C.Cr.P. art. 719(A).[22] That independent testing does not extend so far as to permit suppression of documentation and test results that could exculpate a defendant or undermine the State's theory of the case at trial on grounds that the defense experts had the ability to form the same conclusions.[23]

Based on the foregoing, therefore, it appears the district court abused its discretion in determining that the defense had access to and used the serology notes at trial and that the State's obligation of disclosure ceased when the defense was given access to the red jacket and the opportunity to conduct its own testing and consult its own experts. The serology notes were exculpatory evidence the State was obligated to, but did not, disclose.

---

[22] The case of **State v. Franklin**, 03-3072 (La. 4/23/04), 872 So.2d 1051, cited by the State, is inapposite. The case does not address the State's obligation to disclose substantive or exculpatory testing evidence, which is the **Brady** issue presented here. Rather, **Franklin** clarified the scope of discovery obligations in light of the 1997 amendments to La. C.Cr.P. art. 719. Specifically, **Franklin** found the district court did not err by denying a defense request for "not only computer software programs and proprietary macros used in the [DNA] testing but also information with regard to laboratory personnel, outside audits, and proficiency testing programs," because amendments to C.Cr.P. art. 719 provided the defense with the opportunity to conduct independent testing. The **Franklin** per curiam expressly notes that the State had provided the defense with the lab's report and test results.

[23] In fact, defendant's DNA expert retained at trial did not detect high velocity impact blood spatter on the jacket.

## Other Forensic Evidence

The next category of evidence forming the basis of defendant's **Brady** claim consists of crime scene photographs, ballistics bench notes, sketches and diagrams of the crime scene in addition to a letter from DA Investigator Ray Delcomyn to David Exline of RJ Lee Group (the group that performed the gunshot residue testing for the State) explaining the "significance" of the red jacket in the State's case. With respect to the photographs, ballistics bench notes, sketches and diagrams, the district court found that the State did provide a significant number of photographs and other materials that the State believed supported its "five bullet theory" of the case. However, the court noted, "[w]hether the State, the detectives and law enforcement, who contributed to the investigative record following the event, lacked the wherewithal to recognize the need to share all materials with trial counsel is what appears could be the issue."

In addressing some of defendant's specific complaints about the lack of information concerning ricochet marks and photographs that might have documented those marks, the district court ultimately concluded that the trial record does support that photographs were taken and that ricochet marks were noted, especially in connection with testimony regarding the shooting event between Billy Lambert and Mark Moras.[24] However, the district court does not make a finding that *all* of the materials, especially those inconsistent with the State's "five bullet theory," were turned over; the court simply notes that photographs documenting ricochet marks were discussed at trial. Trial counsel for defendant, Attorney Small, testified that the

---

[24] The trial excerpts cited by the district court in this regard are not supportive of the proposition that the crime scene photos, ballistics reports, sketches and diagrams in question were actually produced pre-trial and/or available to defense counsel at trial. The excerpts merely establish that there was discussion at trial of shots having previously been fired in the Lambert home and that at least one photo of potential impact marks from a bullet was taken.

materials, and in particular the Bullet Worksheet,[25] were not in his files and not turned over to him in discovery. The State in brief does not dispute this contention; it argues simply that the materials are not exculpatory.

To the extent that the district court attributed omissions in production to mere negligence or lack of training of law enforcement officials, such unintentional negligence does not relieve the State of its **Brady** obligations. **Brady** holds that suppression of material exculpatory evidence violates due process "irrespective of the good faith or bad faith of the prosecution." **Brady**, 373.U.S. at 87. To the extent that the district court relieved the State of its **Brady** obligations because the defense had retained its own ballistics expert, the district court erred for the same reasons discussed above in connection with the undisclosed serology notes: the availability of an expert witness does not permit suppression of documentation and test results that could exculpate a defendant or undermine the State's theory of the case.

Here, the ballistics evidence was exculpatory, as explained by John Nixon, an expert in firearms, ammunition, and gunshot residue who testified at the post-conviction hearing, to the extent the undisclosed crime scene photos, ricochet and divot marks support a conclusion that at least six or more shots were fired (undermining the State's "five bullet theory" of the crime) and that more than one shooter was involved. Again, contrary to the State's position that the evidence is not exculpatory because it does not take into account Mark Moras's earlier encounter with Lambert wherein shots were fired, evidence need not be definitive to be exculpatory. **Kyles**, 514 U.S. at 450-51.

---

[25] The Bullet Worksheet indicates that three different kinds of projectiles or bullets were recovered at the scene, supporting post-conviction expert John Nixon's hypothesis that more than one firearm was used.

A similar analysis holds true with respect to the letter from investigator Delcomyn to the RJ Lee Group. The district court determined that the letter, which explains the "significance" of the high velocity blood spatter detected on the red jacket,[26] was not disclosed to the defense. The court also determined that the State had no obligation to disclose the letter or the prosecutor's concerns about the "significance" of the evidence to its case because the defense had the opportunity to have the jacket examined by its own expert who could have drawn his own conclusions. As discussed above, however, the State's obligation of disclosure under **Brady** did not cease when the defense was given access to the red jacket and the opportunity to conduct its own testing and consult its own experts. The district court abused its discretion in determining to the contrary.

*Eyewitness Information Inconsistent with Trial Testimony*

The final category of materials the defendant maintains were suppressed by the State in violation of its **Brady** obligations consists of statements obtained from eyewitnesses on the day of the murders. Specifically, the parties stipulated that a four page transcription of the statement of Gary Normand, who testified at trial, was not provided to the defense. The statement, taken on June 5, 1996, contains a handwritten notation at the top of the first page that states: "Says he may have seen another auto—leaving going south (rt. before lunch)—could have been 10:00—check with Wayne Normand." In addition, while the defense was provided with a transcription of the June 4, 1996, interview of Andrew Dunn, that transcript did not contain handwritten notes that appear on the top of the second page that read: "Kirby Brown—saw someone—drop Robinson off—that mo[rn]ing." The defendant maintains

---

[26] The letter explains that the crime lab had reported finding high velocity blood spatter on the sleeves of the jacket in an insufficient quantity to be tested for identification, but other blood spots on the jacket were tested and did not match the DNA of the defendant or any of the victims.

35

that these handwritten notations are exculpatory, and should have been disclosed, because they (1) identify another car fleeing the crime scene around noon, and (2) place defendant outside the Lambert residence at the time the crimes were committed.[27] We agree.[28] The statements and notes should have been disclosed.

## *Materiality*

Having concluded that the State failed to disclose at least some of the exculpatory evidence presented by the defense, the district court nonetheless denied defendant's **Brady** claim on its analysis of the third prong of the required **Brady** showing: materiality. And, in doing so, the court engaged in two legal errors, both affecting its analysis. First, the district court applied an incorrect standard in assessing materiality. In its written reasons for judgment, the court recited the correct test for materiality as reflected in this court's decision in **State v. Bright**, 02-2793 (La. 5/25/04), 875 So.2d 37:

> For purposes of **Brady**'s due process rule, a reviewing court determining materiality must ascertain:
>
> > not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received *a fair trial, understood as a trial resulting in a verdict worthy of confidence.* [Emphasis supplied.]

**Bright**, 02-2793 at 6, 875 So.2d at 42 (quoting **Kyles**, 514 U.S. at 434). However, in the very next sentence, the district court found: "This Court does not view that the evidence that may not have been provided, (for reasons cited above), would have

---

[27] A declaration obtained from Mr. Brown in connection with the post-conviction proceedings attests that on the day of the murders Brown observed defendant being dropped off across the road from the Lambert residence around noon or later, undermining the State's timeline of the morning's events.

[28] The State argues that this evidence is not exculpatory because defendant has failed to produce evidence linking the other vehicle to alternative suspect Mark Moras, and because the declaration of Mr. Brown is "worthless" since he did not testify at the post conviction hearing. Again, the evidence is exculpatory in that it interrupts the State's timeline of events and is consistent with defendant's position that he simply stumbled upon the crime scene and fled.

resulted in a reversal of [defendant's] conviction." This standard is the very standard counseled against in **Bright**: "[T]he reviewing court does not put the withheld evidence to an outcome-determinative test in which it weighs the probabilities that the petitioner would have obtained an acquittal at trial or might do so at a second trial." *Id.* Rather, materiality for **Brady** purposes "is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." **Kyles**, 514 U.S. at 434-35. To prevail on a **Brady** claim (and it bears reiteration), a defendant must demonstrate only that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. Here, the district court applied the wrong standard in conducting its materiality analysis.

The second error committed by the district court in its materiality analysis was its decision to analyze the potential prejudice from each category of undisclosed evidence separately. Pursuant to controlling Supreme Court precedent, for purposes of materiality, reviewing courts are directed to evaluate the cumulative effect of the undisclosed evidence. *Id.* at 436 ("suppressed evidence [is] considered collectively, not item by item"); see also, **Wearry v Cain**, 577 U.S. 385, 394 (2016)(finding the "state postconviction court improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively" as required by **Kyles**). This evaluation is accomplished at the end of the inquiry. **Kyles**, 514 U.S. at 437, n.10 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion."). The rule applies with equal force in Louisiana courts, as this court has previously explained. See, **State v. Louviere**, 00-

37

2085, pp.16-17 (La. 9/4/02), 833 So.2d 885, 898 (evaluating the entirety of a defendant's **Brady** claims so "the evidence [could] be considered collectively," according to **Kyles**); **Marshall**, 94-0461 at 16, 660 So.2d at 826 ("It is not enough for reviewing courts to consider the impact of each item of exculpatory evidence standing alone; the cumulative effect of the suppressed evidence must be considered."). Thus, as the district court did here, it was error to evaluate the materiality of the suppressed evidence item by item and in isolation, rather than collectively.

Whether evidence is material for purposes of a **Brady** violation is a mixed question of law and fact. See, **Mahler v. Kaylo**, 537 F.3d 494, 500 (5th Cir. 2008). Under Louisiana law, mixed questions of law and fact are generally entitled to deference on review. **O'Hern v. Department of Police**, 13-1416, p. 7 (La. 11/8/13), 131 So.3d 29, 33. However, where, as here, legal error (in the form of applying incorrect legal standards in making the materiality determination) interdicts the findings of the district court, *de novo* review is appropriate. See, **Jones v. State**, 22-1455, p. 5 (La. 5/5/23), 362 So.3d 341, 345. Accordingly, this court will proceed to a *de novo* assessment of whether defendant demonstrated that the undisclosed evidence, considered in the aggregate, was material such that disclosure of the suppressed evidence could reasonably be taken to have put the whole case in such a different light as to undermine confidence in the verdict. **Kyles**, 514 U.S. at 435-36. Thus, an evaluation of each category of evidence the defense was deprived of in light of the evidence that each side presented at trial, concludes with the cumulative assessment of the impact of the suppression. **LaCaze**, 645 F.3d at 736 ("The materiality of **Brady** material depends almost entirely on the value of the evidence

relative to the other evidence mustered by the state."), quoting **Rocha v. Thaler**, 619 F.3d 387, 396 (5th Cir. 2010).

*Jailhouse informant Goodspeed's Undisclosed Deal*

In concluding that the defendant was not prejudiced by the State's failure to disclose that it provided Goodspeed with "special treatment" in exchange for his testimony at trial and, thus, the suppression was not material, the district court reasoned that (1) the value of Goodspeed's testimony was very low compared to the other evidence at trial; and (2) given that the jury heard evidence of Goodspeed's three year sentence on his charges in Rapides Parish, when he faced a possible 33 year sentence, "it is unlikely that [ the undisclosed] information would have seriously undermined Goodspeed's testimony any more than the evidence heard by the jury at trial."

In brief, the State adopts and expands upon this reasoning, arguing that "[i]t is ... difficult to consider a witness subjected to more scourging cross examination than Leroy Goodspeed was in this case." It quotes this court's opinion on direct appeal wherein the court noted:

> At trial, defense counsel reminded the jury that Goodspeed had been arrested 24 times, amassed six felony convictions, is mentally ill, takes Haldol for auditory hallucinations, and has admitted that he will say or do anything to get out of prison, where he has spent most of his adult life. Thus, the defense ensured that the jury heard every possible reason to reject Goodspeed's testimony ....

**Robinson**, 02-1869 at 17-18, 874 So.2d at 79.

The flaw in the State's argument in this regard is that it is not factually accurate. As the evidence adduced post-conviction demonstrates, the jury did not hear "every possible reason" to reject Goodspeed's testimony: it did not hear, for example, of the two pardons that were entered in the CAJUN system before he

testified at defendant's trial; it did not see the letter from probation officer Scotty Melancon recommending to Judge Foote that no action be taken to revoke Goodspeed's probation despite his arrest in Lafayette Parish on charges of principal to first degree robbery; it was not alerted to the marginal notes on Becky Goodspeed's transcribed statement "...said this may help you get out of Det;" and it did not hear of Goodspeed's expectation that he would receive beneficial treatment in connection with his pending charges in Lafayette Parish in exchange for his testimony. Despite defense counsel's efforts, Goodspeed repeatedly denied any promises were made or special treatment received during both direct and cross-examination.[29]

While it is certainly true, as the State maintains, that defense counsel challenged Goodspeed's credibility on several fronts, his testimony that he had not received favorable treatment and did not expect to receive favorable treatment in the future in exchange for his testimony against defendant went unchallenged. Not only did this testimony go unchallenged, it was bolstered by the State's solicitation of the testimony of the attorney representing Goodspeed on the Rapides Parish charges, W.T. Armitage, who testified that Goodspeed's status as a potential witness against defendant was not discussed in the pretrial conference in which his Rapides Parish

---

[29] Goodspeed variously testified on direct examination that he came forward because he and his wife, Becky, "talked about it and we both agreed...You know, the right thing to do and I felt it was the right thing to do, too;" that when he gave his statement to detectives, "they did not offer me anything," and he did not ask for anything; and that he was happy to be a witness because "I mean it's the right thing." Finally, on direct, the following exchange occurred:

Q:   Have you received or have you been offered anything for your testimony?
A:   No, sir. I haven't.
Q:   And I assume that you[r] attorney, W.T. Armitage, would know whether that's true or not, too?
A:   I, yes, sir.

On cross-examination, in response to defense counsel's question "[w]ith all of these things that are currently pending against you, what plans do you have to try and help yourself get out of this," Goodspeed replied: "I'm just going to take my lick."

plea deal was worked out, nor was the judge made aware of it.[30] It was also

capitalized upon by the prosecutor in both opening[31] and closing arguments, wherein

the prosecutor told the jury:

> Goodspeed told you, "I didn't ask for anything, and nothing was offered to me." Goodspeed's own attorney took this stand. He looked at you and said, "It wasn't discussed. In the plea bargain negotiation, it wasn't discussed. I didn't know about it, I – and the judge didn't know about it."
>
> . . . .
> ... Goodspeed was not given anything. He was not offered anything. He did not ask for anything.

The materiality of evidence "is best understood by taking the word of the

prosecutor." **Kyles**, 514 U.S. at 444. Here, the prosecutor went to great lengths to

bolster Goodspeed's credibility, eliciting testimony that he did not testify pursuant

to a plea deal on the Rapides Parish charges, but failing to disclose subsequent

documents requesting dismissal of Goodspeed's pending charges in Lafayette Parish

because he has served as an "essential witness" at a murder trial. This conduct

implicates **Giglio** and **Napue**.

---

[30] Armitage testified as follows in response to the prosecutor's questions:

> Q: ... At that pretrial conference did you make the judge aware of was anything discussed that Leroy Goodspeed was a possible witness against Darrell Robinson?
> A: No.
> Q: Was it even discussed?
> A: No.
> Q: As far as you know, was the judge ever even aware of it?
> A: Not as far as I know.

[31] In his opening, the prosecutor told the jury:

> We will offer evidence from an inmate, Rapides Parish Detention Center, Leroy Goodspeed. Leroy Goodspeed will tell you in November of 1997, he had a conversation with Darrell Robinson in which Darrell Robinson said I did that man, two ladies and a young child. And I got rid of the gun. Threw it off a bridge–among other things. No doubt the defense will use every ploy possible to discredit Leroy Goodspeed. Now, Leroy Goodspeed has a felony record. He has some felony convictions. They are mostly drug related. He had a drug addiction. But, you will see from the testimony he did not gain anything for his testimony. And he has absolutely no reason to lie.

In **Giglio**, the petitioner discovered after his conviction that the Government had told a testifying witness that the witness "would definitely be prosecuted if he did not testify, and that if he did testify he would be obliged to rely on the 'good judgment and conscience of the Government' as to whether he would be prosecuted." **Giglio**, 405 U.S. at 153. However, the witness did not disclose this at trial, and the Government argued to the jury that the witness "received no promises that he would not be indicted." *Id.* at 152 The Supreme Court found a Fourteenth Amendment violation and granted the petitioner a new trial. *Id.* at 155.

In **Napue**, the State's principal witness in a murder trial, then serving a 199 year sentence for the same murder, testified in response to a question by the prosecutor that he had received no promise of consideration in return for his testimony. In fact, he had been promised consideration, but the prosecutor took no action to correct the witness's false testimony, although the jury was apprised that a public defender had promised to do what he could for the witness. **Napue**, 360 U.S. at 265. The Supreme Court found a Fourteenth Amendment violation and granted the petitioner a new trial, holding that a conviction obtained through the use of false evidence, known to be such by representatives of the State, is a denial of due process, and that there is also a denial of due process when the State, though not soliciting false evidence, allows it to go uncorrected when it appears. *Id.* at 269. Moreover, the Court added, this principle applies even if the false testimony goes only to the credibility of the witness; and it applies even if the jury was apprised of other grounds for believing that the witness may have had an interest in testifying against the petitioner. *Id.* at 269-70.

**Giglio** and **Napue** stand for the proposition that where a key witness has received consideration or potential favors in exchange for testimony and lies about

those favors, the trial is not fair. **Tassin v. Cain**, 517 F.3d 770, 778 (5th Cir. 2008). Further, as **Tassin** explains:

> Although **Giglio** and **Napue** use the term "promise" in referring to covered-up deals, they establish that the crux of a Fourteenth Amendment violation is deception. A promise is unnecessary. Where, as here, the witness's credibility "was ... an important issue in the case ... evidence of *any understanding or agreement as to a future prosecution* would be relevant to his credibility and the jury was entitled to know of it."

*Id.* (quoting **Giglio**, 405 U.S. at 154-55 (emphasis added)).

Here, defendant presented evidence of an understanding between Goodspeed and the State with regard to his pending charges in Lafayette Parish, and the State failed to correct Goodspeed's testimony that no such understanding or agreement existed, or that Goodspeed had received favorable treatment even prior to his testimony. The district court outlined just some of the evidence presented: (1) the State twice entered pardons into the State's offender tracking system when that is not typically an option for offenders; (2) Goodspeed after testifying made comments to an inmate, Kevin Nichols, about receiving a deal; and (3) phone messages between the Rapides Parish Assistant District Attorney and the Lafayette Parish Assistant District Attorney were exchanged and shortly after the defendant's trial, the Lafayette Parish charges were dismissed. Yet at trial, Goodspeed testified that he had not received or been offered anything in exchange for his testimony, and that, with respect to his pending charges, "I'm just going to take my lick." More importantly, the State bolstered Goodspeed's testimony that no favorable treatment had been offered or received by calling his attorney on the Rapides Parish charges, W. T. Armitage, to testify that Goodspeed's testimony was not a factor in his favorable plea in Rapides Parish. The State not only allowed this deceptive testimony to go uncorrected, it capitalized on the testimony to argue to the jury that Goodspeed did

not gain anything for his testimony, and "he has absolutely no reason to lie." This, in and of itself, demonstrates the materiality of the undisclosed evidence. See, **Lacaze**, 645 F.3d at 737, n.1 ("The State's argument that an unrevealed deal is immaterial after going to such lengths to emphasize [the witness's] credibility and lack of any motives for lying at trial simply lacks force.").

The district court, and the State in turn, attempt to downplay the significance of Goodspeed's testimony, taking the position that the value of his testimony "was very low compared to the other evidence at trial," and that it is unlikely the suppressed information would have undermined Goodspeed's testimony any more than the evidence heard by the jury. However, the case against defendant was based largely on a chain of inferences from circumstantial evidence.[32] The only physical evidence connecting defendant to the murders was the minute transfer bloodstain on the bottom of his left shoe and the end of that shoe's lace, and this evidence (which is consistent with defendant stepping on a small drop of blood when he entered the house) proves only that defendant was present at the Lambert residence, which he admits. Only Goodspeed's testimony provides any indication that defendant was the perpetrator of the murders.

Here, evidence of any understanding or agreement between Goodspeed and the State was central to determining Goodspeed's credibility. The fact that other

---

[32] In its written reasons, the district court outlined the evidence presented at trial as evidence that: (1) defendant had been living at the Lambert residence following his release from the VA hospital; (2) defendant had no employment outside of his work at Lambert's farm; (3) defendant had resumed drinking; (3) defendant fled the scene; (4) Lambert's empty wallet was found in defendant's bedroom; (5) defendant, when apprehended, had Lambert's knife, a pack of cigarettes the same brand as Lambert smoked, and $71.00 in cash; (6) gunshot residue was detected on defendant's waistband; (7) a towel with Nicholas Kelly's blood was found on the floor of Lambert's bedroom; (8) two drops of Nicholas Kelly's blood were found on the bottom of defendant's shoe and a shoe lace; and (9) testimony from jailhouse informant.

44

impeaching evidence was presented to the jury does not undermine the materiality of the undisclosed evidence.

> The materiality inquiry does not turn on which of two competing sources of bias a court, in hindsight, determines the jury would have considered more important. Rather, the inquiry is whether an undisclosed source of bias–even if it is not the only source or even the "main source"–could reasonably be taken to put the whole case in a different light.

*Id.* at 736 (citing **Kyles**, 514 U.S. at 434-35).

The State's suppression prevented the defense from impeaching Goodspeed's claim that he received no inducements for his testimony, so the jury heard uncontradicted testimony that defendant admitted to the murders. Under these circumstances, there is at least a "reasonable likelihood" the disclosure to the jury of Goodspeed's motive for testifying against defendant might have affected the jury's judgment and put the whole case in a different light. As a result, the nondisclosure, in and of itself, was material under **Brady, Napue,** and **Giglio**.

*Undisclosed Forensic Evidence*

In addition to the undisclosed deal with jailhouse informant Goodspeed, the State failed to disclose exculpatory forensic evidence in the form of the Serology Report and notes, the letter from Investigator Delcomyn explaining the "significance" of the red jacket in the State's case, and crime scene photographs, ballistics bench notes, sketches and diagrams of the crime scene. Defendant maintains, and we agree, that the disclosure of this evidence would have resulted in a weaker case for the State and a stronger case for the defense, as the defense could have used the evidence to attack the probative value of the physical evidence and the State's theory of the case.

As discussed at length, *supra,* the undisclosed serology notes document high-velocity impact blood spatter on the front, back and sleeves of the red jacket, as well

45

as transfer blood stains on the back of the jacket. Undisclosed photographs taken at the crime scene include close-up images of the red jacket and of a blood drip on the neighboring wall. According to post-conviction defense expert, Stuart James, these undisclosed materials demonstrate that the unknown blood spatter resulted from a violent incident, and that the blood stains on the red jacket and the passive drip stain on the wall were most likely part of the same bloodshed event.

The State recognized the importance of this evidence to its case, memorializing the "significance" of the high velocity impact blood spatter in conjunction with the unidentified third party transfer stains on the back of the jacket in Delcomyn's undisclosed letter to the State's gunshot residue expert. And, it elicited trial testimony from David Peart, Lambert's cousin and neighbor, to preempt any argument by trial counsel that the red jacket was connected to the crime (and an unidentified person was involved in the homicides). Peart's testimony suggested the bloodstains resulted from minor work-related injuries on Lambert's cattle farm, misleadingly implying the blood stains on the jacket were innocuous and unrelated to the homicides, despite the fact that the State knew this explanation was inconsistent with the undisclosed serology notes.

Post-conviction testing revealed the transfer stains on the jacket matched the DNA profile of alternative suspect, Mark Moras. Had defense counsel known of the State's forensics expert's conclusion regarding the high-velocity impact blood spatter, he could have, as he testified, used that information to impeach David Peart's testimony and to advance his alternative theory that another person was present and had committed the crimes. Indeed, if defense counsel had been provided the serology notes, the prosecutor could not have argued, as he did in closing: "Finally, if not [defendant], who?" Defense counsel could have used the undisclosed evidence to

undermine the State's theory of the case and bolster his defense that another person, *i.e.,* Mark Moras, committed the crimes.

A similar analysis holds true with respect to the undisclosed ballistic notes and crime scene photographs. At trial, the State theorized that one assailant had fired five bullets from the gun Doris Foster claimed to have returned to Lambert approximately a week before the murders.[33] The undisclosed materials contradict this theory. Upon reviewing the undisclosed evidence, post-conviction expert John Nixon opined that it is likely more than one firearm was used at the scene, at least six gunshots were fired, and the shots likely came from more than one shooter. This evidence could have been used by the defense to undermine the State's theory as to what happened the day of the murders and to provide a plausible alternative narrative of the crime. As evidence that could have been used to attack the investigation and lessen the credibility of the State's case, it was material. See, **Kyles,** 514 U.S. at 445 (undisclosed evidence is material if it could have been used to attack the investigation and lessen the credibility of the State's case).

*Undisclosed Witness Statements*

The final category of undisclosed exculpatory evidence left for us to consider consists of the suppressed statement of Gary Normand and the interview of Andrew Dunn from which a notation regarding Kirby Brown was redacted. Handwritten notes on the Normand statement indicate that Normand and his brother Wayne "may have seen another auto" leaving around the time of the murders. Notes handwritten on the transcribed Dunn interview indicate that Kirby Brown may have seen someone drop defendant off at Lambert's home that morning.

---

[33] In fact, a murder weapon was never recovered; the State's theory was just that: a theory.

The undisclosed information from Gary Normand's statement—that another car was seen leaving the area—could have been used to support defendant's argument that another person committed the murders and to impeach law enforcement officers for failing to adequately investigate alternative suspects. The information regarding Kirby Brown could have been more devastating to the State's case. Had defense counsel been alerted to this information, counsel could have located and interviewed Mr. Brown, who revealed in his post-conviction declaration that he had observed defendant being dropped off across the road from the Lambert residence around noon, or later, the day of the murders. Such testimony would have directly contradicted the State's timeline of that day's events. In his closing, the prosecutor argued to the jury that defendant arrived at the Lambert house between 11:15-11:45 am, shot the victims between 11:45-11:50 am, and then had until 12:10 pm (when Doris Foster came upon the scene) to gather money, cigarettes and Billy's pocketknife and flee. Brown's statement, in contrast, has defendant being dropped off at the Lambert residence after noon, making it impossible for him to have committed the murders according to the State's timeline. However, defense counsel was unable to challenge this timeline because the notation identifying Kirby Brown as a potential witness was suppressed. The undisclosed information regarding Mr. Brown was clearly material under **Brady**. See, **Juniper v. Zook**, 876 F.3d 551, 570 (4th Cir. 2017) ("Courts have found withheld evidence material when the evidence undermined the government's theory as to when a petitioner committed a crime.").

48

*Cumulative Effect of Undisclosed Evidence*

In assessing the significance of the evidence withheld, it is important to reiterate that the case against defendant was based largely on circumstantial evidence. The only physical evidence presented by the State consisted of two particles "unique to" and one particle "characteristic of" gunshot residue detected in the waistband of defendant's jeans,[34] and the minute amount (two drops) of victim Nicholas Kelly's blood found on the bottom of defendant's left shoe and the end of that shoe's lace. The only evidence that identified defendant as the perpetrator was the testimony of jailhouse informant, Goodspeed.

Through this post-conviction proceeding, defendant demonstrated that the State failed to disclose (1) evidence showing Goodspeed's beneficial treatment, (2) serology evidence potentially implicating an alternate suspect, (3) crime scene documentation and notes with the potential to contradict the State's "five bullet" theory of the case, and (4) witness statements potentially placing defendant outside the State's timeline of events. Considered separately, each item undermines the strength of the State's case; considered cumulatively they convince us that we can have no confidence that the jury's verdict would not have been affected had the suppressed evidence come to light.

Nevertheless, in brief, the State takes the position that none of the suppressed evidence was material and its suppression was inconsequential because the presence of Nicholas Kelly's blood on the bottom of defendant's shoe and the end of his shoe lace conclusively establishes defendant's guilt. The State rests its argument on the

---

[34] Post-conviction expert John Nixon explained that gunshot residue evidence has low probative value due to the number of possible sources (beyond discharge of a gun) for the particles commonly identified with gunshot residue and the ease of transfer of such particles from one surface to another. Because the particles identified with gunshot residue can come from other sources, Nixon explained that the definitions have evolved over the years and particles once considered "unique to" gunshot residue are now described as merely "characteristic of" gunshot residue.

lack of any bloody footprints at the scene and the testimony of defendant's post-conviction expert in bloodstain pattern analysis, Stuart James. However, a review of Mr. James's testimony reveals that the State's theory that the lack of bloody footprints at the scene proves defendant acquired the blood on his shoe while the victim was actively bleeding, and not later (as defendant maintains) upon stumbling upon the scene, was just that: a theory or hypothesis proposed to the expert, who in response to State's question, responded: "That could be possible.... Yeah. Based on that hypothesis, yes." On re-direct, Mr. James testified that it also possible that someone could have stepped into a room[35] and come in contact with a pool of blood without leaving a bloody footprint. Far from being conclusive, the evidence regarding the small amount of blood on defendant's shoe is equivocal, and the State's reliance on this single item of evidence—far from proving the strength of its case, and the immateriality of the suppressed evidence—underscores our conclusion that the largely circumstantial case upon which defendant's conviction rests would have been much weaker than the one heard by the jury had the undisclosed evidence been presented.

The State went to great lengths in this case to refute any contention that jailhouse informant Goodspeed testified pursuant to any inducements (even going so far as to call his attorney to bolster this claim). The undisclosed evidence regarding the favorable treatment Goodspeed did receive would have allowed defense counsel to impeach this claim, and undermine the credibility of the only witness to identify defendant as the perpetrator of the homicides. When considered together with the undisclosed serology notes and other crime scene evidence that could have been used by defendant to support his claim that another person may have been involved and to rebut the testimony of David Peart elicited by the State to conceal the relevance of the

---

[35] Nicholas Kelly was the victim closest to the front door.

undisclosed serology evidence, we find ourselves left with a singular conclusion: the defendant did not receive a fair trial, or a verdict worthy of confidence. He is entitled to a new trial under **Brady, Giglio,** and **Napue**.

## CONCLUSION

For the foregoing reasons, defendant's conviction is reversed, his sentence is vacated, and this case is remanded to the district court for a new trial.

**CONVICTION AND SENTENCE VACATED; REMANDED FOR NEW TRIAL.**

# SUPREME COURT OF LOUISIANA

## No. 2021-KP-00812

## STATE EX REL. DARRELL J. ROBINSON

## VS.

## DARREL VANNOY, WARDEN, LOUISIANA STATE PENITENTIARY, ANGOLA, LOUISIANA

On Supervisory Writ to the 9th Judicial District Court, Parish of Rapides

**Crichton, J., concurs in part and dissents in part, and assigns reasons.**

I agree with the majority that the state did not disclose favorable evidence to the defendant, but I dissent in part because, in my view, the cumulative effect of the withheld evidence did not deprive defendant the right to a fair trial *as to his guilt*. *See United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). As to the penalty, though, I believe that in the absence of the suppressed evidence, the death sentences imposed in this case are not "worthy of confidence," and must be overturned. *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). For that reason, I would affirm the ruling of the trial court denying defendant's post-conviction *Brady* claims as to his convictions but reverse the ruling of the trial court as to the penalties, vacate defendant's four death sentences, and remand to the trial court to convene a new penalty phase trial.

On May 28, 1996, at approximately 12:10 p.m., Doris Foster arrived at the home of her cousin, Billy Lambert. Foster discovered the bodies of Lambert, his sister Carol Hooper, Carol's daughter Maureen Kelly, and Maureen's infant son, Nicholas Kelly, all shot in the head. She left immediately and drove to a nearby store where the clerk called 911. When she returned to the scene with the police she noticed that Lambert's truck, which had been there when she arrived earlier, was now gone.

It was soon discovered that defendant, who had been staying in Lambert's home at the time, had fled the scene in Lambert's truck. At trial, the state presented evidence of defendant's highly suspicious behavior. Witnesses testified seeing him speed away from the home at about 12:15 p.m. Defendant drove erratically, swerving into other lanes of traffic, forcing motorists off the road, and side-swiping another vehicle. A chase ensued and defendant was followed until he turned down a driveway, drove through a fence, abandoned the truck behind a house, and ran into the woods where the police later found him hiding. As they approached, defendant told the officers he was unarmed and "on medication for violent tendencies."

Besides his incriminating conduct, the state presented additional physical evidence connecting defendant to the crime. When he was arrested, defendant had Nicholas's blood on the sole and lace of his shoe, Lambert's knife in his pocket, and some cash and cigarettes in his possession. At the crime scene, a spot of Nicholas's blood was found on a towel in Lambert's bedroom and Lambert's wallet, emptied of cash, was found in defendant's room. All four victims were shot with a .38 caliber gun, the same caliber gun Lambert was known to keep in the house, but the weapon was never recovered. A gunshot residue expert testified that he found one particle on defendant's shirt, a few particles on his waistband, and many particles on his pant legs.

Finally, the state called Leroy Goodspeed to testify against defendant. Goodspeed testified that in November 1997, while the two men were jailed together, defendant confessed to him that he "did those people, a man, two women and a small child, and threw the gun off of a bridge." Critically, the confession Goodspeed testified about is not self-corroborating. In other words, it does not contain information that only the perpetrator of the crime could have known.[1] Since the

---

[1] The identity of the victims of the crime was well-known public information and the murder weapon was never discovered, under a bridge or elsewhere.

reliability of the confession cannot be determined by its substance alone, to believe that defendant confessed to the crime, a juror must have taken Goodspeed on his word that it occurred. Thus, Goodspeed's credibility became and remains a relevant factor in this case.

At trial, Goodspeed's credibility was put to a rigorous test. He underwent a blistering cross-examination by defendant's highly experienced attorney using abundant impeachment evidence that had been turned over by the state. The jury heard that that Goodspeed had been arrested 24 times, amassed six felony convictions, was mentally ill, took medication for auditory hallucinations, and admitted that he will "say or do anything to get out of prison." *State v. Robinson*, 2002-1869, pp. 17–18 (La. 4/14/04), 874 So.2d 66. The jury also learned that when Goodspeed reported defendant's confession, he had been facing up to 33 years in prison on charges pending in Rapides Parish; however, before defendant's trial, Goodspeed accepted a plea deal in which he was sentenced to three years imprisonment at hard labor with one year suspended, and was released after serving 11 months of that sentence. The state dispelled any suspicion this outcome related to his assistance in defendant's case by calling Goodspeed's attorney who testified that the lenient sentence he received was not related to his testimony against defendant.[2]

Nevertheless, despite the defense's successful incrimination of his character, Goodspeed maintained that he had not received, requested, or been promised anything from the state in exchange for his testimony against defendant. He explained that he was only doing so because it was "the right thing to do." The jury heard that Goodspeed had charges pending against him in Lafayette, where he was facing up to life in prison, but his testimony suggested that he was unaware that his

---

[2] There are, of course, a myriad of reasons, aside from seeking cooperation from Goodspeed, that the state may have offered him a plea deal on these charges.

3

assistance in defendant's case in Rapides Parish could possibly result in beneficial treatment in Lafayette Parish. In its opening statement, the state asserted that Goodspeed had no reason to lie about the confession and nothing to gain from his testimony. In closing, the state stressed that Goodspeed was not given anything, offered anything, and did not ask for anything in exchange for his testimony.

After the trial, defendant discovered additional evidence that further impeached Goodspeed's already marred credibility. As noted above, Goodspeed denied receiving any favorable treatment from the state for his testimony at defendant's trial in March 2001. However, on two occasions (on January 29, 1999, and on February 2, 2001) pardons were entered into the Department of Corrections offender tracking system on Goodspeed's behalf.[3] In addition, on December 18, 2000, a probation officer wrote a letter to a judge recommending that Goodspeed's probation in Rapides Parish not be revoked despite his arrest on first degree robbery charges in Lafayette Parish. Neither the pardon entries nor the probation letter was disclosed to defendant before Goodspeed testified against him. As a result, the jury did not learn that Goodspeed had received these additional benefits from the state after he came forward about the confession but before he testified against defendant.

A discussed above, at trial Goodspeed denied asking for or being promised anything from the state in exchange for his testimony against defendant. However, there is evidence, presented in post-conviction, from which one can reasonably infer Goodspeed was incentivized by the state to testify against defendant. First, the Lafayette Parish charges that were pending against Goodspeed at the time of defendant's trial were all later dismissed expressly because he testified against defendant. Rapides Parish Assistant District Attorney Mike Shannon testified in post-conviction that after trial Goodspeed asked him to put in a "good word" for him

---

[3] During the post-conviction hearing, the state could not provide an explanation as to how or why these entries were made.

4

with the Lafayette Parish District Attorney, he called and asked them to "find a way to assist him [because] he was a material witness in a murder case." Internal memoranda in the Lafayette Parish District Attorney file shows they made good on this request and dismissed Goodspeed's charges because he was "an essential witness in a murder trial." Second, while Goodspeed testified that he was only testifying against defendant because "it was the right thing to do," Kevin Nichols testified in post-conviction that when Goodspeed returned to his cell immediately after testifying against defendant, he indicated he was worried "that he was not getting his deal and he was headed back to Lafayette." Nichols's account points to Goodspeed's belief that he had a deal with the state before he testified in defendant's trial. Third, a post-conviction investigator spoke with Goodspeed in March 2012. He told her that he received a deal on his Lafayette Parish charges in exchange for his testimony against defendant.[4] Fourth, the Rapides Parish District Attorney file contained a handwritten note in the margin of a transcript of a police interview with Goodspeed's wife about the confession. The note was scribbled over but appears to say, in part, "try & reconcile...said this may help you to get out Det[ention]."

Weighing this evidence together, against the self-serving testimony of Goodspeed at trial and Shannon in post-conviction—who both denied the existence of a pre-trial deal—one could nevertheless reasonably conclude that there was, in fact, some promise of additional, future aid by the state in exchange for Goodspeed's testimony against defendant. Yet this agreement was not disclosed to defendant and not revealed at trial. Without this information, defendant was not able to show to the jury that, contrary to the claims of the prosecutor, Goodspeed *did* have a reason to lie about defendant's confession and that, despite his assertions otherwise,

---

[4] Since Goodspeed died before the post-conviction hearing, we are relegated to considering hearsay evidence about his involvement in defendant's trial. While this is permitted in post-conviction proceedings, it is accorded less weight than if he had testified at the hearing and been subjected to the test of cross-examination. *State ex rel. Tassin v. Whitley*, 602 So.2d 721, 724 (La. 1992).

Goodspeed was *not* only testifying because it was "the right thing to do." Thus, while Goodspeed was thoroughly impeached at trial, the jury did not hear *all* the reasons to reject his testimony as incredible.

There is additional favorable evidence that the state did not turn over to the defense besides the undisclosed benefits made and promised to Goodspeed. At trial, the jury heard about a red jacket collected from the Lambert house that was stained with the blood of an unknown third party.[5] At trial, the state presented testimony suggesting that the blood on the jacket came from an injury sustained by a farm worker and was not related to the murders. Contrary to the theory posited to the jury, the state's own experts had examined the jacket before the trial and concluded that some of the blood on the jacket was "high or medium velocity spatter." This classification connects the blood on the jacket to a gunshot event and, thus, to the murder. This fact was not disclosed to defendant before trial. If it had been, the defense could have countered the state's theory of the origins of the blood and argued that it pointed to the presence of someone other than defendant at the house when the murders occurred.

Finally, the state withheld handwritten notes providing investigative leads relating to the timeline of the crime and when defendant was seen at the Lambert house on the morning of the murders. The jury heard from two witnesses who recalled seeing Lambert's truck speeding away from the house at around 12:15 p.m. In closing argument, the prosecutor told the jury that defendant arrived at the Lambert house between 11:15 and 11:45 a.m., shot the victims between 11:45 and 11:50 a.m., and then had until 12:10 p.m. (when Doris Foster arrived) to steal Lambert's money, knife, and cigarettes before fleeing in his truck. However, the

---

[5] At trial the jury heard that the blood on the jacket was not from defendant or any of the victims. Later, post-conviction DNA testing of revealed that it came from Mark Moras, a former resident of the Lambert house who had an ongoing conflict with Lambert and who was the alternate perpetrator urged by defendant at trial.

6

state did not reveal to the defense that one of the witnesses told the police that he and his brother may have seen another vehicle leave the house that morning. The state also suppressed a note about another witness, Kirby Brown, who saw defendant being dropped off at the Lambert house that morning. If the state had told defendant about Brown, they would have interviewed him and learned that he recalled seeing defendant being dropped off at the Lambert house at 12 p.m. or later that day. If this evidence had been turned over, the jury would have heard testimony that was inconsistent with the state's timeline and consistent with defendant's claim that he happened upon the victims after they were murdered and fled in panic.

The cumulative effect of all the undisclosed evidence—the beneficial treatment provided to Goodspeed by the state, the serological evidence relating to the bloodstained jacket, and the investigative leads relating to the timeline of the crime—is noteworthy. However, in my view, even taking into account the suppressed evidence, the case for defendant's guilt remains strong and worthy of confidence.[6] Thus, unlike the majority, I decline to conclude that the withheld evidence is material to the guilty verdicts and would not disturb defendant's convictions.[7]

Importantly, and distinct from the dissent, I believe that the withheld evidence undermines confidence in defendant's death sentences, and I would reverse the ruling of the trial court as to the penalty phase. In *Brady v. Maryland*, the United

---

[6] La. R.S. 15:438 permits convictions based on circumstantial evidence alone when, "assuming every fact to be proved that the evidence tends to prove, [] exclude[s] every reasonable hypothesis of innocence." Furthermore, as this Court explained in *State v. Davies*, 350 So.2d 586, 588 (La. 1977), "[e]vidence of flight, concealment, and attempt to avoid apprehension . . . indicates consciousness of guilt and, therefore, is one of the circumstances from which the jury may infer guilt."

[7] In so doing, I am cognizant of the impact overturning murder convictions has on surviving victims. *See State v. Reddick*, 2021-1893, pp. 15–16 (La. 10/21/22), 351 So.3d 273, 283. As I acknowledged in *Reddick*, "[e]ven when the evidence can be reassembled, conducting retrials years later inflicts substantial pain on crime victims who must testify again and endure new trials." *Id.*, quoting *Edwards v. Vannoy*, 593 U.S. ---, 141 S.Ct. 1547, 1554–55, 209 L.Ed.2d 651 (2021) and citing *United States v. Mechanik*, 475 U.S. 66, 72, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) ("[V]ictims may be asked to relive their disturbing experiences.").

7

States Supreme Court held that a due process violation occurs when the state withholds favorable evidence that is "material either to guilt *or to punishment*." 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963) (emphasis added). During a penalty phase of a capital trial, the jury is required to consider "[a]ny [] relevant mitigating circumstance" when determining the appropriate sentence to be imposed. La. C.Cr.P. art. 905.5(h). The United States Fifth Circuit Court of Appeals has "frequently recognized the strategic value of relying on 'residual doubt'" by defendants during the sentencing phase of a capital trial. *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 n. 33 (5th Cir. 1993). Residual doubt has been defined as "a lingering uncertainty about facts—a state of mind that exists somewhere between 'beyond a reasonable doubt' and 'absolute certainty.'" *Franklin v. Lynaugh*, 487 U.S. 164, 166, 108 S.Ct. 2320, 2323, 101 L.Ed.2d 155 (1988).

At the trial on the sentence, "[o]ne or more jurors [may] retain[] minor trepidations about the nature" of the state's evidence "or [feel] a general ambivalence about imposing the death penalty," and that "uncertainty, though not rising to the level of reasonable doubt regarding guilt, might [lead] such a juror to hold out for a life sentence." *State v. Lee*, 524 So.2d 1176, 1192 (La. 1987). The United States Supreme Court has acknowledged that "[e]vidence that is material to guilt will often be material for sentencing purposes as well." *Cone v. Bell*, 556 U.S. 449, 473, 129 S.Ct. 1769, 1784, 173 L.Ed.2d 701 (2009). While not giving rise to a reasonable doubt, there is a reasonable probability that the evidence withheld by the state in this case, considered cumulatively, may have reasonably caused at least one juror to nevertheless entertain some residual doubt about defendant's guilt, and that juror "can be expected to resist those who would impose the irremedial penalty of death." *Smith v. Balkcom*, 660 F.2d 573, 580–81 (5th Cir. 1981).

"The *Brady* rule is based on the requirement of due process. Its purpose is . . . to ensure that a miscarriage of justice does not occur." *United States v. Bagley*,

473 U.S. 667, 675, 105 S.Ct. 3375, 3379–80, 87 L.Ed.2d 481 (1985). We are required to apply heightened care to protecting the due process rights of the defendant in capital prosecutions. *See Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (explaining that because of the "qualitative difference" between the death penalty and life imprisonment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."). Applying the heightened standard of care applicable to capital cases, it is my opinion that there is a reasonable probability that the *Brady* materials in this case would have caused trepidations about the nature of the state's case sufficient to cause one or more jurors to withhold capital punishment.[8] For this reason, I believe the state's withholding of favorable evidence resulted in a miscarriage of justice rendering the death sentence imposed in this case not worthy of confidence. Therefore, I would vacate the sentence and remand the case for a new trial on the penalty phase.[9]

---

[8] *See* La. C.Cr.P. art. 905.8, "The court shall sentence the defendant in accordance with the determination of the jury. If the jury is unable to unanimously agree on a determination, the court shall impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence."

[9] Pursuant to La. C.Cr.P. art. 61, the District Attorney has the discretion to retry the penalty phase of the trial or not seek a capital verdict. In that circumstance, the trial court shall impose a sentence of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. *See* La. R.S. 14:30(C)(2).

SUPREME COURT OF LOUISIANA

No. 2021-KP-00812

STATE EX REL. DARRELL J. ROBINSON

VS.

DARREL VANNOY, WARDEN, LOUISIANA STATE PENITENTIARY,
ANGOLA, LOUISIANA

On Supervisory Writ to the 9th Judicial District Court, Parish of Rapides

**CRAIN, J.**, dissenting.

Billy Lambert, Carol Hooper, Maureen Kelly, and Maureen's infant son, Nicholas Kelly, were all murdered in Lambert's home on May 28, 1996. Defendant was spotted frantically fleeing the scene in Lambert's pickup truck at a high rate of speed, spinning-out, side-swiping a vehicle, and running other motorists off the road. An ensuing car chase ended with defendant driving through a fence, abandoning the truck, and fleeing on foot into nearby woods. Apprehended shortly thereafter, defendant had Nicholas's blood on his shoe and Lambert's knife in his pocket. Lambert's wallet, emptied of cash, and a towel stained with Nicholas's blood were found in defendant's room at Lambert's home. All four victims were shot at close range with a .38 caliber gun, the same caliber pistol Lambert had in his house before, but was never found after, the murders. Gunshot residue was found on defendant's shirt, waistband, and pants.

A unanimous jury found defendant guilty on all four counts of first degree murder and recommended the death sentence, which the trial court imposed. On direct appeal, this court unanimously affirmed the verdict and sentence, finding "the circumstantial evidence presented at defendant's trial excluded any reasonable hypothesis of his innocence." *State v. Robinson*, 02-1869 (La. 4/14/04), 874 So. 2d

66, 75. The majority now finds the verdict not "worthy of confidence." I respectfully disagree.

The majority's decision rests largely on the premise that the state failed to disclose a purported "deal" between the state and Leroy Goodspeed, the jailhouse informant who testified defendant admitted to the murders. This finding is contradicted by direct evidence from four witnesses who testified that nothing was promised or offered to Goodspeed in exchange for his testimony. These witnesses are Mike Shannon, the lead prosecutor in the murder trial; Ray Delcomyn, the district attorney's investigator for the murder trial; W.T. Armitage, a defense attorney who represented Goodspeed in a criminal proceeding in Rapides Parish; and Goodspeed himself. Implicitly finding these witnesses all committed perjury, the majority defers to a "factual conclusion" by the trial court "that the State failed to disclose that Goodspeed in fact testified in exchange for beneficial treatment." I cannot find any such conclusion by the trial court.

In written reasons rejecting defendant's claim, the trial court pointed out that during the trial, "much effort was put forth to attack and reveal any possible 'deal' made with Leroy Goodspeed." The trial court noted that Goodspeed, under cross-examination, admitted that he "would do anything in his power to avoid being in jail"; and the jury was informed about the three-year sentence he received in the recently concluded Rapides Parish criminal proceeding. The trial court then reviewed the "new" evidence presented by defendant, describing it as "more detailed evidence . . . that *appears* to indicate Goodspeed *may have been* allowed special treatment." (Emphasis added.) The trial court identifies the pardons, the statements allegedly made by Goodspeed to a cellmate and a defense investigator, and documents showing some communications between Sherman (the Rapides Parish assistant district attorney) and a Lafayette assistant district attorney over two months after defendant's trial. But, the trial court made no factual conclusions about any of

2

this "new" evidence. Instead, the court pretermitted any finding as to the existence of the alleged deal and found no *Brady* violation based on a lack of materiality, reasoning that Goodspeed's trial testimony was limited and subject to extensive cross-examination about a possible deal. This is apparent from the closing sentences of the trial court's reasons on this issue:

> The value of Goodspeed's testimony was very low compared to the other evidence brought against [defendant] at trial. Unlike witnesses in most cases where such Brady violations are found, he was not an eyewitness nor was his testimony central to [defendant's] case. Goodspeed's testimony contained only an alleged jailhouse confession .... The jury was presented with evidence of special treatment at trial, which defense counsel was able to use to impeach Goodspeed in its cross-examination. The only additional evidence now being brought by [defendant] is similar circumstantial evidence *possibly showing* further special treatment received at later dates following the trial. Therefore, it is unlikely that this information would have seriously undermined Goodspeed's testimony any more than the evidence heard by the jury at trial. [Emphasis added.]

"[P]ossibly showing" something is not a factual conclusion. Particularly where that conclusion means four witnesses, including both parties to the alleged deal, committed perjury.

Absent a factual finding by the trial court, *de novo* review of the relevant evidence is appropriate on appeal to determine if defendant proved the state promised or offered Goodspeed anything in exchange for his testimony. *Cf. State v. Thompson*, 11-0915 (La. 5/8/12), 93 So. 3d 553, 563 ("When a trial court makes findings of fact . . ., a reviewing court owes those findings great deference.") Based upon my review of the evidence, defendant did not prove a deal between the state and Goodspeed. Assistant District Attorney Sherman and Goodspeed both expressly testified there was no agreement, understanding, or any other arrangement to induce Goodspeed to testify. Their testimony was corroborated by the district attorney's investigator, who testified he was present for all meetings with Goodspeed and no deal was ever discussed; and Goodspeed's defense attorney in the Rapides Parish proceeding, who confirmed there was no deal in that matter.

3

The contrary evidence is mostly inferences drawn from letters and other communications that were adequately explained at the evidentiary hearing. The probation officer who sent the letter to the judge presiding over Goodspeed's probation did not say the letter was part of a deal or had been requested by anyone. Instead, as recognized by the majority in footnote 7, the officer testified it was not uncommon for him to not recommend revocation when there was a pending charge, and "apparently I chose not to recommend revocation, between my supervisor and I." The probation proceeding was pending in Rapides Parish, so it is not surprising that the Rapides Parish District Attorney's office was copied with the letter. Sherman likewise explained the circumstances surrounding him contacting the Lafayette Parish assistant district attorney after defendant's trial. That was at the urging of a relative who had been in a halfway house with Goodspeed. The majority also points to the "pardons" entered into a database by the Department of Corrections, but there is no evidence the Rapides Parish District Attorney is authorized to direct such entries or was otherwise involved in that record keeping by the Department of Corrections. The only testimony referring to a deal is second-hand information reported by Goodspeed's cellmate and a defense investigator, which I find are not more persuasive than the direct testimony from the witnesses involved in the alleged deal, all of whom refute it.

Finding no agreement between the state and Goodspeed, the state did not violate its obligation to disclose any such agreement and did not present, or fail to correct, false testimony. *See Giglio v. United States*, 405 U.S. 150, 150-51; 92 S.Ct. 763, 764; 31 L.Ed.2d 104 (1972); *Napue v. People of State of Ill.*, 360 U.S. 264, 265; 79 S.Ct. 1173, 1175; 3 L.Ed.2d 1217 (1959).

Defendant alternatively argues the state should have disclosed the letter from the probation officer, the existence of the two pardons, and the prosecutor's notes in the margin of a statement from Goodspeed's wife. This information is neither

4

exculpatory nor sufficiently material to constitute a *Brady* violation. "Favorable evidence is material . . . if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433; 115 S.Ct. 1555, 1565; 131 L.Ed.2d 490 (1995). Whether considered in isolation or cumulatively with the other *Brady* evidence, disclosure of the probation officer's letter, the prosecutor's notes, and the pardons would not "have made a different result reasonably probable." *See Kyles*, 514 U.S. at 441; 115 S.Ct. at 1569. In affirming the jury's verdict against defendant, this court reviewed all of the evidence and specifically recognized the strength of the state's circumstantial evidence, which "excluded any reasonable hypothesis of his innocence." *Robinson*, 874 So. 2d at 75. Commenting on Goodspeed's testimony, this court observed, "Clearly . . . the quantum of the State's proof was significantly more than the testimony of Leroy Goodspeed." *Robinson*, 874 So. 2d at 78. I agree. Given the convincing nature of the state's circumstantial evidence, the failure to produce information that, at best, might marginally further impeach Goodspeed's testimony is not a *Brady* violation.

Defendant also maintains the state failed to disclose serology and other lab notes from the North Louisiana Criminalistics Laboratory, as well as diagrams, and photographs. The trial court rejected this contention, finding, "The trial record supports the State did disclose these pieces of evidence." Delcomyn, the district attorney's investigator, testified that he requested any and all laboratory notes from the Crime Labs in Alexandria and Shreveport. He received a large package of materials that he personally delivered to the defense attorney's office. Defendants were additionally given full access to the Crime Lab. This information was also not material, particularly given that defendant's expert had prolonged possession of the jacket that is the subject of the note related to blood splatter on the jacket sleeve.

5

Lastly, I find no merit to defendant's factually-innocent claim under Louisiana Code of Criminal Procedure article 926.2. To prevail, a defendant must prove "by clear and convincing evidence that, had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt." La. Code Crim. Pro. art. 926.2B(1)(b). Defendant relies on evidence indicating that blood on the back of a jacket in Lambert's house was from an alternative suspect identified by the defense. The presence of this blood does not exculpate defendant in these murders to the point that "no rational juror would have found him guilty." *Id.*

Defendant had a fair trial that resulted in convictions on four counts of first degree murder. These convictions should not be set aside based on inferences drawn from limited circumstantial evidence where every witness with personal knowledge of the relevant events confirmed the actual facts. I dissent and would affirm the trial court's judgment.

# SUPREME COURT OF LOUISIANA

## No. 2021-KP-00812

## STATE EX REL. DARRELL J. ROBINSON

### VS.

## DARREL VANNOY, WARDEN, LOUISIANA STATE PENITENTIARY, ANGOLA, LOUISIANA

On Supervisory Writ to the 9th Judicial District Court, Parish of Rapides

**McCallum, J., dissents for the reasons assigned by Justice Crain and assigns additional reasons.**

I respectfully dissent from the majority opinion for the reasons assigned by Justice Crain in his dissenting opinion. I write separately to emphasize that the jury weighed testimony and determined that the defendant was guilty of the murders of three adults and a child. The jury then determined that the defendant's actions warranted the death penalty. On direct appeal, this court affirmed the defendant's convictions and sentence. *State v. Robinson*, 02-1869 (La. 4/14/04), 874 So. 2d 66. The United States Supreme Court denied certiorari, leaving those convictions and sentence undisturbed. *Robinson v. Louisiana*, 543 U.S. 1023 (2004).

After a review of the record, I agree with the trial court's denial of the defendant's petition for post-conviction relief. Unlike the majority, I find that the cumulative effect of the withheld evidence did not deprive defendant of the right to a fair trial, and the guilty verdicts and the convictions are worthy of confidence. Since the disputed evidence related to guilt, not the penalty, in my opinion, it logically follows that the death sentence imposed by the jury is also worthy of confidence.